EFiled: Jun 12 2014 01:00PM EDT
Transaction ID 55583898
Case No. 7141-VCL

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE: EL PASO PIPELINE PARTNERS, )     C.A. No. 7141-VCL
L.P. DERIVATIVE LITIGATION           )

## MEMORANDUM OPINION

Date Submitted: April 16, 2014
Date Decided: June 12, 2014

Jessica Zeldin, ROSENTHAL, MONHAIT & GODDESS, P.A., Wilmington, Delaware;
Jeffrey H. Squire, Lawrence P. Eagel, Raymond A. Bragar, BRAGAR EAGEL &
SQUIRE, PC, New York, New York; *Attorneys for Plaintiffs*.

Peter J. Walsh, Jr., Brian C. Ralston, Matthew F. Davis, Samuel L. Closic, POTTER
ANDERSON & CORROON LLP, Wilmington, Delaware; *Attorneys for Defendants El
Paso Pipeline GP Company, L.L.C., El Paso Corporation, Douglas L. Foshee, John R.
Sult, Ronald L. Kuehn, Jr., D. Mark Leland, Arthur C. Reichstetter, William A. Smith,
and James C. Yardley*.

Lewis H. Lazarus, Thomas E. Hanson, Jr., Courtney R. Hamilton, MORRIS JAMES
LLP, Wilmington, Delaware; *Attorneys for Nominal Defendant El Paso Pipeline
Partners, L.P.*

**LASTER, Vice Chancellor.**

In March 2010, El Paso Corporation sold to El Paso Pipeline Partners, L.P. (the "Partnership" or "El Paso MLP") a 51% interest in Southern LNG Company, L.L.C. ("Southern LNG") and a 51% interest in El Paso Elba Express Company, L.L.C. ("Elba Express"). In this lawsuit, the plaintiffs challenge both the March 2010 transaction and a subsequent November 2010 transaction in which El Paso MLP acquired the remaining 49% interests in Southern LNG and Elba Express. After discovery, the defendants moved for summary judgment in their favor, and the plaintiffs cross moved for summary judgment as to liability. This decision grants the defendants' motion for summary judgment as to the March 2010 transaction. The plaintiffs' cross motion as to the March 2010 transaction is consequently denied. This opinion does not address the November 2010 transaction.

## I.    FACTUAL BACKGROUND

The facts are drawn from the materials presented in support of the cross motions for summary judgment. When considering the defendants' motion, conflicts in the evidence must be resolved in favor of the plaintiffs and all reasonable inferences drawn in their favor. At this stage of the case, the court cannot weigh the evidence, decide among competing inferences, or make factual findings.

### A.    The Partnership Structure

El Paso MLP is a Delaware limited partnership headquartered in Houston, Texas. El Paso MLP operates as a master limited partnership ("MLP"), a term that refers to a publicly traded limited partnership that is treated as a pass-through entity for federal income tax purposes. El Paso MLP owns interests in companies that operate natural gas

1

pipelines, liquid natural gas ("LNG") terminals, and storage facilities throughout the United States. Its common units trade on the New York Stock Exchange under the symbol "EPB."

MLPs that focus on transporting and storing oil and natural gas, like El Paso MLP, are commonly referred to as midstream MLPs. Midstream MLPs are typically "sponsored" by a corporation with MLP-qualifying assets that generate stable cash flows. The sponsor seeks to maximize the market value of those assets by selling them to an MLP that can issue publicly traded securities on the strength of the cash flows and distribute the cash periodically to investors in a tax-efficient manner. In the typical structure, the sponsor owns 100% of the general partner of the MLP, giving the sponsor control over the MLP. The sponsor initially contributes a block of assets to the MLP and, over time, sells additional assets to the MLP. Because the assets move from the sponsor level down to the MLP level, the sales are referred to colloquially as "drop-downs."

In August 2007, El Paso Corporation ("El Paso Parent") formed El Paso MLP and contributed to El Paso MLP an initial set of MLP-qualifying assets. On November 15, El Paso MLP announced an initial public offering of 25,000,000 common units. The IPO prospectus cautioned that El Paso Parent would have no obligation to drop down additional assets into El Paso MLP. Despite this disclosure, El Paso Parent was plainly creating a sponsored MLP, implying that El Paso MLP over time would acquire assets from El Paso Parent.

Consistent with the typical MLP structure, El Paso Parent indirectly owns 100% of defendant El Paso Pipeline GP Company, L.L.C., a Delaware limited liability company

2

and the general partner of El Paso MLP (the "General Partner"). The General Partner in turn owns a 2% general partner interest in El Paso MLP. By virtue of the general partner interest, El Paso Parent has a 2% economic interest in El Paso MLP and, more importantly, exercises control over El Paso MLP. At the time of the transaction in question, El Paso Parent also owned, either through the General Partner or its affiliates, approximately 61.4% of El Paso MLP's outstanding common units plus all of its incentive distribution rights. As is customary with sponsored MLPs, El Paso MLP has no employees of its own. Employees of El Paso Parent manage and operate El Paso MLP's business.

At the time of the March 2010 transaction, defendants Douglas L. Foshee, James C. Yardley, John R. Sult, D. Mark Leland, Ronald L. Kuehn, William A. Smith, and Arthur C. Reichstetter (together, the "Individual Defendants") constituted the board of directors of the General Partner (the "GP Board"). Four of the Individual Defendants held management positions with El Paso Parent or the General Partner. Foshee was the President and CEO of El Paso Parent. Yardley served as an Executive Vice President of El Paso Parent and as President and CEO of the General Partner. Sult served as CFO of El Paso Parent and the General Partner. Leland served as an Executive Vice President of El Paso Parent and President of El Paso Midstream Group, Inc., having previously served as the CFO of El Paso Parent and the General Partner. Each of the management directors beneficially owned equity stakes in El Paso Parent that dwarfed their equity stakes in El Paso MLP.

The other three members of the GP Board were outside directors, although two had past ties to El Paso Parent. Kuehn was Interim CEO of El Paso Parent in 2003 and served as Chairman of the Board of El Paso Parent from 2003 until 2009, one year before the challenged transaction occurred. Smith was an Executive Vice President of El Paso Parent and Chairman of El Paso Merchant Energy's Global Gas Group until 2002. Reichstetter was the only director without past ties to El Paso Parent.

At the time of the challenged transaction, El Paso Parent was itself a publicly traded Delaware corporation headquartered in Houston, Texas. In May 2012, El Paso Parent was acquired and became a wholly owned subsidiary of Kinder Morgan, Inc.

## B. The Drop-Down Proposal

On February 9, 2010, El Paso Parent offered to sell to El Paso MLP 49% interests in Southern LNG and Elba Express. El Paso Parent proposed that El Paso MLP would pay $865 million and assume $147 million of debt, for total value of $1.012 billion. On February 15, El Paso Parent altered its proposal to offer 51% of Southern LNG and Elba Express for $900 million plus the assumption of $153 million in debt, for total value of $1.053 billion. This decision refers to El Paso MLP's eventual purchase of 51% of Southern LNG and Elba Express as the "Drop-Down."

Southern LNG owned an LNG terminal on Elba Island, a private 840-acre island off the coast of Georgia. Elba Express owned a 190-mile natural gas pipeline that connected the Elba Island terminal to four major interstate natural gas pipelines. The Elba Island terminal was built in the 1970s to receive LNG shipped from overseas, store it, and vaporize it for distribution in the United States. Shortly after it was built, market

4

developments made importing LNG unattractive, and the terminal was mothballed for nearly 20 years. It resumed operations in 2001 after market developments made importing LNG attractive again.

In 2006, when the market for imported LNG was strong, El Paso Parent sought approval from the Federal Energy Regulatory Commission ("FERC") for a two-phase expansion of the Elba Island facility, referenced respectively as Phase III-A and Phase III-B. Royal Dutch Shell, plc ("Shell") reserved the output from Phase III-A, and BG Group plc ("British Gas") secured an option to reserve the output from Phase III-B.

By 2010, when El Paso Parent proposed the Drop-Down, domestic discoveries of shale gas and improved techniques for its extraction had led to higher levels of domestic production and lower gas prices. As a result, the market for imported LNG had weakened. Demand at the Elba Island facility fell to less than 10% of capacity, and El Paso Parent assumed that British Gas would not exercise its option for Phase III-B. At the time, the principal sources of revenue for Southern LNG and Elba Express were existing contracts with subsidiaries of Shell and British Gas (the "Service Agreements"). Under the Service Agreements, the subsidiaries had reserved 100% of the firm capacity of the Elba Island terminal and the Elba Express pipeline, guaranteeing that Shell and British Gas would have the capacity to transport or store gas at any time for a set charge. Because the Service Agreements were firm contracts, Southern LNG and Elba Express would charge fees to Shell and British Gas regardless of whether they actually stored or transported gas. The Service Agreements had terms of 25 to 30 years.

5

Despite their lengthy terms and firm pricing, the Service Agreements were not sure things. The Shell and British Gas counterparties were special purpose entities with no assets of their own. If the Service Agreements became sufficiently unprofitable, then Shell and British Gas could walk away from their subsidiaries, leaving Southern LNG and Elba Express to collect from judgment-proof shells. Although other subsidiaries of Shell and British Gas had guaranteed the counterparties' performance, those guarantees only covered approximately 20% of the revenue that the Service Agreements otherwise might generate.

The plaintiffs believe that because of the weakened domestic market for imported LNG, El Paso Parent faced a significant risk that Shell and British Gas would choose to breach the Service Agreements, leaving Southern LNG and Elba Express with less than 20% of their anticipated revenue. The plaintiffs argue that through the Drop-Down, El Paso Parent sought to off-load these now-risky assets onto El Paso MLP at an inflated price.

## C.    The Conflicts Committee

Because El Paso Parent controlled El Paso MLP through the General Partner, and because El Paso Parent owned the assets that El Paso MLP would be acquiring, the Drop-Down created a conflict of interest for the General Partner. El Paso MLP's limited partnership agreement (the "LP Agreement" or "LPA") contemplated that El Paso MLP could proceed with a transaction that presented a conflict of interest for the General Partner if El Paso MLP followed one of four contractual paths set out in Section 7.9(a) of the LP Agreement. One of the contractual paths authorized El Paso MLP to proceed if

the conflict-of-interest transaction received "Special Approval." The LP Agreement defined this form of approval as "approval by a majority of the members of the Conflicts Committee acting in good faith." LPA § 1.1. The LP Agreement in turn defined the Conflicts Committee as

> a committee of the Board of Directors of the General Partner composed of two or more directors, each of whom (a) is not a security holder, officer or employee of the General Partner, (b) is not an officer, director or employee of any Affiliate of the General Partner, (c) is not a holder of any ownership interest in the Partnership Group other than Common Units and awards that may be granted to such director under the Long Term Incentive Plan and (d) meets the independence standards required of directors who serve on an audit committee of a board of directors established by the Securities Exchange Act and the rules and regulations of the Commission thereunder and by the National Securities Exchange on which the Common Units are listed or admitted to trading.

*Id.*

At El Paso MLP, the Conflicts Committee was not a standing committee of the GP Board, but rather a committee constituted on an *ad hoc* basis to consider specific conflict-of-interest transactions. On February 12, 2010, the GP Board resolved to seek Special Approval for the Drop-Down. The resolution established a limited-duration iteration of the Conflicts Committee for that purpose, specifying that this incarnation of the Conflicts Committee would

> automatically dissolve upon the earlier to occur of the time at which (i) either such Conflicts Committee or the [GP] Board determines that there are no terms which appear to be acceptable to both sides and which would be within parameters that would allow the Conflicts Committee to grant Special Approval regarding the [Drop-Down] or (ii) the [Drop-Down] is consummated.

Transmittal Affidavit of Samuel L. Closic dated Oct. 30, 2013 (the "Closic Aff.") Ex. 5 at EPP0002.

The resolution granted the Conflicts Committee, for the period of existence, the power and authority

> to evaluate and assess whether the [Drop-Down] is fair and reasonable to the Partnership and, if the Conflicts Committee so determines, (a) to approve the [Drop-Down] as provided by Section 7.9(a) of the Limited Partnership Agreement and (b) to make a recommendation to the [GP] Board whether or not to approve such terms and conditions of the [Drop-Down].

*Id.* at EPP0003. The resolution provided that when acting for these purposes, the Conflicts Committee would "assume and exercise all lawfully delegable powers and authority of the [GP] Board in taking any of the aforesaid actions and in making any and all decisions relating to the [Drop-Down]." *Id.* The resolution also provided that "the officers, agents and employees of [El Paso MLP] are hereby authorized to assist the Conflicts Committee and to provide it with all information and documents that it requests with respect to the [Drop-Down]." *Id.* at EPP0003-04.

The resolution named Reichstetter, Kuehn, and Smith as the members of the committee. At its first meeting on February 19, 2010, the Conflicts Committee appointed Reichstetter to serve as Chair. At some point, the committee retained Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") as its legal advisor and Tudor, Pickering, Holt & Co. ("Tudor") as its financial advisor. The engagements appear to have happened as a matter of course before the Conflicts Committee ever formally met.

8

As suggested by the ready hiring of Akin Gump and Tudor, the record reflects that El Paso Parent, the GP Board, and the individuals who served on the Conflicts Committee have developed a level of comfort with the Special Approval process:

- Between 2008 and 2012, El Paso Parent and El Paso MLP engaged in eight drop-down transactions. Although El Paso MLP's initial public offering prospectus stated that El Paso MLP could obtain assets from third parties, the eight drop-down deals were the exclusive means by which El Paso MLP acquired assets.

- El Paso Parent initiated each transaction. El Paso MLP never initiated a transaction.

- On each occasion, the General Partner opted to proceed by Special Approval and formed a Conflicts Committee.

- On each occasion, the members of the Conflicts Committee were Kuehn, Smith, and Reichstetter.

- On each occasion, Reichstetter served as Chair of the Conflicts Committee and did the bargaining for the Conflicts Committee.

- On each occasion, the committee hired Tudor as its financial advisor.

- On each occasion, the Conflicts Committee obtained some marginal improvement in the terms of El Paso Parent's original proposal.

- On each occasion, Tudor opined that the resulting deal was fair and collected a $500,000 fee plus expenses.

The Special Approval process for the Drop-Down fit this pattern.

### D.  Special Approval Is Granted.

Over the course of the next month and a half, the Conflicts Committee met five times to review El Paso Parent's proposal. On February 19, 2010, Tudor held its first due diligence session with El Paso Parent management, including representatives of Southern LNG and Elba Express. El Paso Parent management gave Tudor a fifty-four page

presentation that provided an overview of the proposed transaction and Southern LNG's and Elba Express's assets, including a summary of the Service Agreements. The summary described the Service Agreements as long-term, fixed-fee contracts, but noted that the contractual counterparties were subsidiaries of Shell and British Gas rather than Shell and British Gas themselves. The summary also noted that the counterparties' obligations were covered by multi-year guarantees from other subsidiaries of Shell and British Gas that had Aa2/AA+ and A2/A credit ratings, respectively. The presentation included a chart that set forth the total demand revenue that Southern LNG and Elba Express would receive over the life of the Service Agreements and the total amount of the demand revenue that was guaranteed by the Shell and British Gas subsidiaries.

Later in the day on February 19, 2010, the Conflicts Committee held its initial meeting. The committee formally elected Reichstetter as Chair and discussed due diligence issues with Tudor. According to the minutes of the meeting, Tudor explained that El Paso Parent management had

> spoken at length about the high quality of the assets, operations and cash flows of [Southern LNG and Elba Express] that made them attractive investments, including (i) the long term, demand-charge contracts backed by substantial guarantees from Shell and British Gas, (ii) the stable, long-term cash flows, (iii) minimal maintenance capital requirements, (iv) dual docks, (v) the absence of commodity price exposure and (vi) significant natural gas take-away capacity with access to numerous substantial pipelines.

Closic Aff. Ex. 5 at EPP0012. The minutes recite that the Conflicts Committee discussed "how the valuation of the [interests] could be affected by the projected growth [of less than 1%] and the stability of the cash flows, which were impacted by the firm, long-term,

demand charge contracts, as well as the related credit analysis, including the substantial sponsor support from Shell and British Gas." *Id.* The plaintiffs argue that by stressing the "long-term" nature of the Service Agreements and the "substantial" guarantees and support from Shell and British Gas, the El Paso Parent representatives and Tudor misled the Conflicts Committee about the value of those agreements.

The Conflicts Committee next met on February 24, 2010, when Tudor presented its preliminary financial analysis. Tudor's analysis addressed (i) the cash flow accretion of the proposed transaction, (ii) factors affecting the value/yield of El Paso MLP units, (iii) a summary of the current state of the public capital markets, (iv) recent midstream drop-down transactions comparable to the proposed transaction, (v) Tudor's preliminary valuation analysis, and (vi) the pro forma impact of the proposed transaction on El Paso MLP. Tudor's preliminary valuation analysis included a discounted cash flow analysis, a transaction comparables analysis, and a publicly traded company comparables analysis. The Conflicts Committee focused primarily on the discounted cash flow analysis. According to the minutes, the Conflicts Committee discussed that "due to the nature and quality of the assets . . . , the [Drop-Down] likely could have a positive affect [sic] on the Partnership's credit rating." *Id.* at EPP0017. The plaintiffs assert that the continued emphasis on the quality of the Southern LNG and Elba Express assets demonstrates that the Conflicts Committee did not fully understand how easily Shell and British Gas could walk away from the Services Agreement and the limited coverage provided by the guarantees.

11

The Conflicts Committee met again on March 2, 2010. Tudor had updated its financial analysis to address questions previously raised by the Conflicts Committee. In discussing the Drop-Down's probable impact on El Paso MLP's credit rating, Tudor explained that members of El Paso MLP had met with the Fitch, Moody's, and S&P ratings agencies, and the ratings agencies were "cautiously optimistic about the possibility of receiving in the near future a ratings upgrade to an 'investment grade' rating." Closic Aff. Ex. 5 at EPP0023. In addition, the Conflicts Committee asked, hypothetically, whether Tudor would be a buyer at the 10.8x EBITDA multiple implied by the Drop-Down. According to the minutes, Tudor advised that "a 10.8x EBITDA multiple tended to be higher than the average multiples applicable to more recent M&A transactions in [the] midstream sector" but that "such a multiple was consistent with the lower risk profile of [Southern LNG and Elba Express]." *Id.* Given their assessment of the Services Agreements, the plaintiffs disagree that the Southern LNG and Elba Express assets had a "lower risk profile."

After the meeting on March 2, 2010, Reichstetter met with representatives of El Paso Parent to negotiate the transaction price. After some limited back and forth, they agreed upon consideration of $963 million, consisting of $661 million in cash, common units of El Paso MLP worth $149 million, and the assumption by El Paso MLP of a 51% share of the $300 million of outstanding debt owed by Southern LNG and Elba Express. The parties later agreed to value the common units at $27.87 per unit, representing the highest of the average of the volume-weighted average prices of the common units for the 5-, 10-, and 20-day trading periods ending on March 23, 2010. Dividing the agreed-upon

12

figure of $149 million by the price of $27.87 resulted in the issuance of 5,346,251 common units to El Paso Parent.

On March 17, 2010, the Conflicts Committee met and received an updated valuation analysis from Tudor. The materials addressed the implied return on El Paso MLP's potential investment and suggested that it would exceed the implied return that might typically be associated with a long-term firm contract with either Shell or British Gas. The materials also addressed counterparty credit risk associated with the Southern LNG and Elba Express contracts. Akin Gump provided a presentation on the current and historical credit ratings of Shell and British Gas and on issues relating to applicable FERC regulations.

On March 24, 2010, the Conflicts Committee met for the fifth and final time. Tudor again delivered an updated analysis. The valuation summary, or "football field," showed that El Paso Parent's offer price for Southern LNG and Elba Express fell within or below the range of values established by Tudor's chosen valuation metrics. Tudor opined that the proposed transaction was "fair, from a financial point of view, to the holders of the Common Units of [El Paso MLP], other than [the General Partner] and its affiliates." *Id.* at EPP0057. The Conflicts Committee then unanimously approved resolutions recommending that El Paso MLP enter into the Drop-Down. As part of the resolutions, the Conflicts Committee

> determined that the [Drop-Down] is fair and reasonable to the Partnership
> and to the holders of common units of the Partnership other than the
> General Partner and its affiliates, in each case, taking into account the
> totality of the relationships between the parties involved (including other

13

transactions that may be particularly favorable or advantageous to the Partnership).

*Id.* at EPP0042. The Conflicts Committee also "approve[d] the [Drop-Down] . . . pursuant to Section 7.9(a) of the [LP] Agreement relating to 'Special Approval.'" *Id.* Later that day, the GP Board adopted the Conflicts Committee's recommendation.

On March 25, 2010, El Paso MLP announced that it had agreed to the Drop-Down. The transaction closed shortly thereafter.

**E.     El Paso Parent Declines To Exercise A Right Of First Refusal For Gulf LNG.**

Unbeknownst to the Conflicts Committee, at the same time that El Paso Parent was proposing to sell LNG assets to El Paso MLP and touting their value, El Paso Parent was turning down an opportunity to buy LNG assets for itself. El Paso Parent held a 50% interest in Gulf LNG, an entity that owned a LNG terminal in Pascagoula, Mississippi. El Paso Parent also managed Gulf LNG and had a right of first refusal on a 30% interest in Gulf LNG that a third party was proposing to sell to GE Capital.

When El Paso Parent emailed its opening proposal for the Drop-Down to the members of the GP Board on February 9, 2010, defendants Sult, Yardley, and Leland knew that GE Capital had agreed to purchase 30% of Gulf LNG. Later that same day, Sult and Yardley received an internal presentation showing that the price GE Capital had agreed to pay implied an EBITDA multiple of 9.1x. After reviewing the presentation, Sult sent an email to Leland describing Gulf LNG's finances as "[n]ot a pretty picture." Affidavit of Jeffrey H. Squire dated Oct. 29, 2013 (the "Squire Aff.") Ex. 87. El Paso Parent declined to exercise its right of first refusal.

14

During the negotiation of the Drop-Down, the Conflicts Committee did not know about the proposed Gulf LNG transaction, the implied EBITDA multiple for that deal, or El Paso Parent's decision not to exercise its right of first refusal at that price. El Paso Parent and the members of the GP Board who knew about the proposed transaction did not disclose its existence or any of its details to the Conflicts Committee.

According to the plaintiffs, the fact that El Paso Parent decided not to acquire an LNG asset at a lower implied EBITDA multiple while at the same time selling its own LNG assets to El Paso MLP for a higher implied EBITDA multiple was highly material information that should have been provided to the Conflicts Committee. The plaintiffs contend that the Gulf LNG deal illustrated arm's-length pricing for a comparable LNG asset, such that the Conflicts Committee's decision to buy a similar LNG asset at a significantly higher implied EBITDA multiple gives rise to an inference of bad faith. The plaintiffs also argue that El Paso Parent's concealment of the information from the Conflicts Committee means that Special Approval was not properly obtained.

## F.     Post-Transaction Events

Both sides have relied on post-transaction events. The defendants have cited various after-the-fact developments in an effort to confirm the wisdom of the Conflicts Committee's decision to approve the Drop-Down. The plaintiffs have identified different post-transaction events in an attempt to support an inference that the Conflicts Committee acted in bad faith. Under Delaware law, business decisions are not judged by hindsight. The defendants' actions must stand or fall based on what they knew and did at the time.

## G.     This Litigation

On December 22, 2011, the plaintiffs filed a lawsuit challenging the Drop-Down. The plaintiffs later filed a second suit challenging the November 2010 transaction in which El Paso Parent sold El Paso MLP assets that included the remaining 49% interests in Southern LNG and Elba Express.  On March 4, 2013, the two actions were consolidated.  A consolidated complaint was never filed.  Instead, both complaints were designated as operative pleadings for the consolidated action (respectively, the "First Complaint" and the "Second Complaint").

Count I of each complaint asserted that by engaging in the pertinent drop-down transaction, the defendants violated their express contractual obligations and the implied covenant of good faith and fair dealing.  Count II of each complaint asserted that any defendant not directly liable for breach of contract was secondarily liable for aiding and abetting the breaches of contract.  Count III of each complaint asserted that any defendant not directly liable for breach of contract tortiously interfered with the plaintiffs' contractual rights.  Count IV of each complaint alleged that El Paso Parent was unjustly enriched.

On February 21, 2012, before the Second Complaint had been filed, the defendants moved to dismiss the First Complaint.  On October 26, the court heard argument on the motion.  Ruling from the bench, the court granted the motion to dismiss as to Count IV and decided one narrow aspect of Count I.  The court denied the motion as to the remainder of Count I and all of Counts II and III.

In dismissing Count IV of the First Complaint in its entirety, the court held that the allegations of the complaint supported only two alternatives. Either the defendants complied with their contractual obligations, in which case there was no unjust enrichment, or the defendants breached their contractual obligations, in which case the appropriate claim was for breach of contract. Count IV therefore failed to state a claim.

As to Count I of the First Complaint, the court ruled on only one narrow aspect of the breach of contract claim. In paragraph 99 of the First Complaint, the plaintiffs alleged that the members of the Conflicts Committee failed to meet the independence requirements set forth in the LP Agreement, such that they could not have given Special Approval. After reviewing the allegations of the complaint and considering the language of the LP Agreement, the court held that the complaint did "not plead facts which suggest that any member of the [Conflicts Committee] was disqualified." *Brinckerhoff v. El Paso Pipeline GP Co.*, C.A. No. 7141-CS, at 52 (Del. Ch. Oct. 26, 2012) (TRANSCRIPT).

The plaintiffs have not challenged or sought to revisit these rulings, which are law of the case for purposes of both the First Complaint and the Second Complaint. Most pertinently for this decision, it is undisputed that the Conflicts Committee was duly constituted and met the requirements of the LP Agreement.

After the hearing on the motion to dismiss the First Complaint, the parties proceeded with discovery. After completing fact and expert discovery, the defendants moved for summary judgment in their favor, and the plaintiffs cross moved for summary judgment as to liability. The trial was deferred to permit the court to rule on the cross motions. This decision rules on the motions only to the extent they address the March

17

2010 drop-down challenged in the First Complaint. This decision does not address the November 2010 drop-down challenged in the Second Complaint.

## II. LEGAL ANALYSIS

Under Court of Chancery Rule 56, summary judgment "shall be rendered forthwith" if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Ct. Ch. R. 56(c). The moving party bears the initial burden of demonstrating that, even with the evidence construed in the light most favorable to the non-moving party, there are no genuine issues of material fact. *Brown v. Ocean Drilling & Exploration Co.*, 403 A.2d 1114, 1115 (Del. 1979). If the moving party meets this burden, then to avoid summary judgment the non-moving party must "adduce some evidence of a dispute of material fact." *Metcap Sec. LLC v. Pearl Senior Care, Inc.*, 2009 WL 513756, at *3 (Del. Ch. Feb. 27, 2009), *aff'd*, 977 A.2d 899 (Del. 2009) (TABLE); *accord Brzoska v. Olson*, 668 A.2d 1355, 1364 (Del. 1995).

On an application for summary judgment, "the court must view the evidence in the light most favorable to the non-moving party." *Merrill v. Crothall-American, Inc.*, 606 A.2d 96, 99 (Del. 1992). "Any application for such a judgment must be denied if there is any reasonable hypothesis by which the opposing party may recover, or if there is a dispute as to a material fact or the inferences to be drawn therefrom." *Vanaman v. Milford Mem'l Hosp., Inc.*, 272 A.2d 718, 720 (Del. 1970).

> [T]he function of the judge in passing on a motion for summary judgment is not to weigh evidence and to accept that which seems to him to have the greater weight. His function is rather to determine whether or not there is any evidence supporting a favorable conclusion to the nonmoving party.

When that is the state of the record, it is improper to grant summary judgment.

*Cont'l Oil Co. v. Pauley Petroleum, Inc.*, 251 A.2d 824, 826 (Del. 1969). "The test is not whether the judge considering summary judgment is skeptical that [the non-movant] will ultimately prevail." *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1150 (Del. 2002). "If the matter depends to any material extent upon a determination of credibility, summary judgment is inappropriate." *Id.* When a party's state of mind is at issue, a credibility determination is "often central to the case." *Johnson v. Shapiro*, 2002 WL 31438477, at *4 (Del. Ch. Oct. 18, 2002).

"There is no 'right' to a summary judgment." *Telxon Corp. v. Meyerson*, 802 A.2d 257, 262 (Del. 2002). When confronted with a Rule 56 motion, the court may, in its discretion, deny summary judgment if it decides upon a preliminary examination of the facts presented that it is desirable to inquire into and develop the facts more thoroughly at trial in order to clarify the law or its application. *See, e.g.*, *Cerberus*, 794 A.2d at 1150; *Alexander Indus., Inc. v. Hill*, 211 A.2d 917, 918-19 (Del. 1965).

## A.    Breach Of The Express Terms Of The LP Agreement

Count I of the First Complaint contends that the defendants breached both their express and implied contractual obligations. This section addresses the express obligations. Part II.B, *infra*, addresses the implied obligations.

### 1.    The Proper Defendant

As a threshold matter, summary judgment on Count I of the First Complaint is granted in favor of all defendants other than the General Partner. Count I asserts a claim

19

for breach of contract. "It is a general principle of contract law that only a party to a contract may be sued for breach of that contract." *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 172 (Del. 2002). The General Partner is the only defendant that was a party to the contract. The defendants other than the General Partner were not parties to the LP Agreement and are entitled to summary judgment on Count I.

### 2. The Operative Contractual Framework

To determine whether the evidence supports a potential breach of the LP Agreement, it is necessary to understand the operative contractual framework. Section 7.9(e) of the LP Agreement eliminates all common law duties that the General Partner and the Individual Defendants might otherwise owe to El Paso MLP and its limited partners, including fiduciary duties. The LP Agreement replaces those duties with contractual commitments. A high-level overview of the structure of the LP Agreement reveals that it divides the decisions that the General Partner might make into three broad categories: (i) decisions made by the General Partner in its individual capacity, (ii) decisions made by the General Partner in its capacity as the General Partner that do not involve a conflict of interest, and (iii) decisions made by the General Partner in its capacity as the General Partner that involve a conflict of interest. Each type of decision has its own contractual standard.

For decisions that the General Partner makes in its individual capacity, the LP Agreement states that the General Partner does not owe any duty to El Paso MLP or any of the limited partners, can act in its own interest, and does not have to believe in good

20

faith that its actions are in the best interests of El Paso MLP. Section 7.9(c) sets forth the

relevant contractual language:

> Whenever the General Partner makes a determination or takes or declines to take any other action . . . in its individual capacity as opposed to in its capacity as the general partner of the Partnership, . . . then the General Partner . . . [is] entitled, to the fullest extent permitted by law, to make such determination or to take or decline to take such other action free of any duty (including any fiduciary duty) or obligation whatsoever to the Partnership, any Limited Partner or Assignee, . . . and the General Partner . . . shall not, to the fullest extent permitted by law, be required to act in good faith or pursuant to any other standard imposed by this Agreement . . . [or] any other agreement contemplated hereby or under the Delaware Act or any other law, rule or regulation or at equity.

LPA § 7.9(c).

For decisions the General Partner makes in its capacity as the General Partner that

do not involve a conflict of interest, the General Partner must only believe in good faith,

subjectively, that its actions are in the best interests of El Paso MLP. Section 7.9(b) sets

forth the relevant contractual language:

> Whenever the General Partner makes a determination or takes or declines to take any other action . . . in its capacity as the general partner of the Partnership as opposed to in its individual capacity . . . then, unless another express standard is provided for in this Agreement, the General Partner . . . shall make such determination or take or decline to take such other action in good faith and shall not be subject to any other or different standards (including fiduciary standards) . . . . In order for a determination or other action to be in "good faith" for purposes of this Agreement, the Person or Persons making such determination or taking or declining to take such other action must believe that the determination or other action is in the best interests of the Partnership.

*Id.* § 7.9(b).

At first blush, this standard appears to apply to all decisions made by the General

Partner in its capacity as the General Partner. Analytically, however, Section 7.9(b)

21

applies only to decisions made by the General Partner in its capacity as the General Partner that do not involve a conflict of interest, because Section 7.9(b) states that the standard it sets forth will apply "unless another express standard is provided for in this Agreement." *Id.* When a decision involves a potential conflict of interest on the part of the General Partner, Section 7.9(a) provides "another express standard." *See id.* § 7.9(a).

Under Section 7.9(a), if the General Partner takes action in its capacity as the General Partner, and the action involves a conflict of interest, then the action will be "permitted and deemed approved by all Partners" and "not constitute a breach" of the LP Agreement or "any duty stated or implied by law or equity" as long as the General Partner proceeds in one of four contractually specified ways. *Id.* The relevant contractual language states:

> Unless otherwise expressly provided in this Agreement . . . , whenever a potential conflict of interest exists or arises between the General Partner . . . , on the one hand, and the Partnership . . . , any Partner or any Assignee, on the other, any resolution or course of action by the General Partner . . . in respect of such conflict of interest shall be permitted and deemed approved by all Partners, and shall not constitute a breach of this Agreement, . . . or of any duty stated or implied by law or equity, if the resolution or course of action in respect of such conflict of interest is (i) approved by Special Approval, (ii) approved by the vote of a majority of the Outstanding Common Units (excluding Common Units owned by the General Partner and its Affiliates), (iii) on terms no less favorable to the Partnership than those generally being provided to or available from unrelated third parties or (iv) fair and reasonable to the Partnership, taking into account the totality of the relationships between the parties involved (including other transactions that may be particularly favorable or advantageous to the Partnership).

*Id.* Because the four contractually specified ways constitute an express standard "provided for in this Agreement," Section 7.9(a) takes a decision involving a conflict of

interest outside the scope of the general decision-making discretion granted to the General Partner under Section 7.9(b).[1]

Notably, Section 7.9(a) has its own introductory phrase—"[u]nless otherwise expressly provided in this Agreement"—which is itself important, because for certain types of transactions that involve a conflict of interest on the part of the General Partner, the LP Agreement sets forth a separate and even more specific contractual standard. For example, Section 7.5 governs the outside activities of the General Partner, covering matters that traditionally would fall under the heading of the corporate opportunity doctrine. *See* LPA § 7.5. Section 7.6 of the LP Agreement addresses loans by the General Partner to the Partnership or its subsidiaries, and Section 7.7 addresses indemnification of the General Partner (and other indemnitees) by the Partnership. *See id.* §§ 7.6, 7.7. The introductory clause to Section 7.9(a) does not create a recursive loop with Section 7.9(b). Instead, it recognizes that the LP Agreement establishes a hierarchy of contractual standards ranging from the general to the specific and that in each case the most specific standard applies.

---

[1] *See, e.g.*, *Gelfman v. Weeden Investors, L.P.*, 792 A.2d 977, 990 (Del. Ch. 2001) (holding that specific provision governing conflict-of-interest transactions controlled in lieu of general provision addressing non-conflicted transaction); *Sonet v. Timber Co.*, 722 A.2d 319, 325 (Del. Ch. 1998) (holding that specific provision in limited partnership agreement controlled over more general provision). *See generally DCV Hldgs., Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005) ("Specific language in a contract controls over general language [and thus] the specific provision ordinarily qualifies the meaning of the general one."); *Wood v. Coastal States Gas Corp.*, 401 A.2d 932, 941 (Del. 1979) (citing the "familiar and well-settled rule[] of construction" that specific contractual provisions control over more general ones); *accord* 11 Richard A. Lord, *Williston on Contracts* § 32:10 (4th ed. 1999) ("Where general and specific clauses conflict, the specific clause governs the meaning of the contract.").

Because El Paso Parent controlled El Paso MLP through the General Partner, and because El Paso Parent owned the assets that El Paso MLP would purchase in the Drop-Down, El Paso Parent's proposals involved a conflict of interest for the General Partner. The Drop-Down therefore implicated the contractual requirements of Section 7.9(a). To comply with the LP Agreement, the General Partner had to proceed in one of the four contractually specified ways. The General Partner chose to proceed by Special Approval, so this decision concentrates on that path.

The LP Agreement defines Special Approval as "approval by a majority of the members of the Conflicts Committee acting in good faith." LPA § 1.1. The LP Agreement defines "good faith" for purposes of a decision by the Conflicts Committee in terms of the members' belief that the decision is in the best interests of El Paso MLP. The pertinent contractual language states:

> Whenever the Conflicts Committee makes a determination or takes or declines to take any other action, it shall make such determinations or take or decline to take such other action in good faith and shall not be subject to any other or different standards (including fiduciary standards) . . . . In order for a determination or other action to be in "good faith" for purposes of this Agreement, the Person or Persons making such determination or taking or declining to take such other action must believe that the determinations or other action is in the best interests of the Partnership.

*Id.* § 7.9(b).

Under Delaware law, the standard for good faith that applies to the Conflicts Committee requires a subjective belief that the determination or other action is in the best interests of El Paso MLP. In construing identical language in another limited partnership agreement, the Delaware Supreme Court held that "an act is in good faith if the actor

24

*subjectively believes* that it is in the best interests of [the partnership]." *Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 104 (Del. 2013). The language therefore establishes a subjective good faith standard and "eschews an objective standard when interpreting the unqualified term 'believes.'" *Id.*

### 3. The Application Of The Subjective Good Faith Standard

Under the subjective good faith standard, "the ultimate inquiry must focus on the subjective belief of the specific directors accused of wrongful conduct." *Encore Energy*, 72 A.3d at 107. The Delaware Supreme Court has admonished that when applying the subjective belief standard, "[t]rial judges should avoid replacing the actual directors with hypothetical reasonable people." *Id.* Nevertheless, because science has not yet developed a reliable method of reading minds, objective facts are logically and legally relevant to the extent they permit an inference that the defendants lacked the necessary subjective belief. *Id.* The high court has provided illustrations of this concept:

> Some actions may objectively be so egregiously unreasonable . . . that they "seem[] essentially inexplicable on any ground other than [subjective] bad faith." It may also be reasonable to infer subjective bad faith in less egregious transactions when a plaintiff alleges objective facts indicating that a transaction was not in the best interests of the partnership and that the directors knew of those facts. Therefore, objective factors may inform an analysis of a defendant's subjective belief to the extent they bear on the defendant's credibility when asserting that belief.
>
> . . . [T]he ultimate inquiry must focus on the subjective belief of the specific directors accused of wrongful conduct. The directors' personal knowledge and experience will be relevant to a subjective good faith determination, which must focus on measuring the directors' approval of a transaction against their knowledge of the facts and circumstances surrounding the transaction.

*Id.* (first two alterations in original and footnote omitted).

25

The *Encore Energy* decision discussed the subjective good faith standard as applied at the pleadings stage. The same legal principles apply at the summary judgment stage, but the procedural standard changes. Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ct. Ch. R. 56(c). In lieu of pled facts, therefore, the plaintiff must provide some evidence to support its position. Consequently, under the principles outlined in *Encore Energy*, to defeat a motion for summary judgment, the plaintiff must point to some evidence from which the court reasonably could infer subjective bad faith. If the plaintiff can meet this burden, a credibility assessment becomes necessary to determine the defendant's state of mind. *Johnson*, 2002 WL 31438477, at *4. "In such cases, the court should evaluate the demeanor of the witnesses whose states of mind are at issue during examination at trial." *Id.*

In this case, the plaintiffs contend that the members of the Conflicts Committee failed to appreciate how easy it would be for Shell and British Gas to walk away from the Service Agreements, that Shell and British Gas would have a significant economic incentive to do so given the weakness in the domestic gas market, and that the value of the projected revenue under the Service Agreements had to be discounted significantly in light of that risk. The plaintiffs also fault the Special Committee for failing to take into account the fact that on February 9, 2010, the same day El Paso Parent made its initial proposal to sell LNG assets to El Paso MLP at a multiple of 12.2x EBITDA, El Paso

26

Parent was analyzing and later decided not to exercise a right to purchase a 30% interest in Gulf LNG at 9.1x EBITDA. As additional evidence of the Conflicts Committee's bad faith, the plaintiffs cite an email Kuehn sent early in the process in which he suggested an EBITDA multiple well below where the Conflicts Committee began negotiating and ultimately ended up. The plaintiffs also rely on two expert reports.

### a. The Service Agreements

The plaintiffs focus primarily on the risk that Shell and British Gas would walk away from the Service Agreements. They have introduced evidence that, if credited, would establish that by the first quarter of 2010, a thriving domestic supply of natural gas was having a negative effect on LNG imports. Shortly after opining on the fairness of the Drop-Down, Tudor published a report on the LNG market that observed that "shale [gas] production has made a mockery of previous estimates of US LNG imports" and that "US regasification facilities are likely to run at very low utilization rates as long as shale growth continues." Squire Aff. Ex. 212 at 5, 46. The plaintiffs also have introduced evidence establishing that the contractual counterparties to the Service Agreements were corporate shells and that only 17% of the projected revenue from the Service Agreements was guaranteed by entities with meaningful assets. Despite these limitations, the Conflicts Committee and Tudor valued the Service Agreements based on 100% of their projected revenue, without any discounting for the risk of breach.

The record establishes that there is no genuine dispute about whether the Conflicts Committee understood the state of the natural gas market. The members of the Conflicts Committee had extensive experience in the energy industry, and they received

presentations about the condition of the natural gas market. No reasonable fact-finder could conclude that the members of the Conflicts Committee lacked information about or failed to understand the dynamics of the natural gas market, the implications of domestic shale gas exploration for the LNG market, and other similar factors.

The record likewise establishes that the Conflicts Committee was informed about the terms of the Service Agreements, the credit profile of the counterparties, and the limited scope of the guarantees. Record evidence shows that the Conflicts Committee and Tudor focused on these issues and conducted due diligence to understand them. The plaintiffs have used excerpts from the directors' deposition testimony to suggest that the members of the Conflicts Committee overestimated the extent to which the Service Agreement revenue was guaranteed. Viewed in the light most favorable to the plaintiffs, this testimony establishes for purposes of summary judgment that the members of the Conflicts Committee did not fully understand the limitations on the guarantees and believed that the guarantees covered a much higher portion of the projected revenue than they actually did.

Wrapping everything together, the plaintiffs contend that the members of the Conflicts Committee consciously disregarded the level of risk inherent in the Service Agreements and acted in bad faith by valuing the revenue as if it were fully guaranteed. Contrary to the plaintiffs' position, the record evidence establishes that the Conflicts Committee considered the revenue risk. Unlike the plaintiffs, the members of the Conflicts Committee believed that the guarantees were meaningful and that even if the guarantees covered only a portion of the Service Agreements' revenue, neither Shell nor

28

British Gas would default. The Conflicts Committee saw little to no risk in the agreements because of El Paso MLP's ongoing relationships with Shell and British Gas, the interests that Shell and British Gas have in maintaining the availability of shipping and storage capacity, and the importance to Shell and British Gas of having a reputation for fulfilling their contracts.

What the plaintiffs really dispute is the weight the Conflicts Committee should have given to risks that both the Conflicts Committee and the plaintiffs identified. Reasonable minds could disagree about the judgment made by the Conflicts Committee, but the Conflicts Committee's judgment was not so extreme that it could support a potential finding of bad faith, nor was the committee's process sufficiently egregious to support such an inference.[2] No reasonable fact-finder could conclude that the Conflicts Committee lacked a good faith belief in its assessment of the value of the Service Agreements. *See, e.g.*, *Encore Energy*, 72 A.3d at 108-09; *see also Atlas Energy*, 2010 WL 4273122, at *15 ("Whether [the Chairman and CEO's] belief was correct is not relevant under the [subjective good faith] standard prescribed by the LLC Agreement.").

---

[2] *See Encore Energy*, 72 A.3d at 108 (holding that allegations that a conflicts committee may have negotiated poorly did not suggest an inference of subjective bad faith); *Brinckerhoff v. Enbridge Energy Co.*, 2011 WL 4599654, at *10 (Del. Ch. Sept. 30, 2011) (dismissing claim that conflicts committee acted in bad faith where committee met with financial and legal advisors to consider transaction), *aff'd*, 67 A.3d 369 (Del. 2013); *In re Atlas Energy Res., LLC*, 2010 WL 4273122, at *14 (Del. Ch. Oct. 28, 2010) (dismissing cause of action against directors and officers where the complaint alleged that members of the conflicts committee "failed even to look at all of its options or to negotiate the best deal available" and holding that such allegations "[did] not suggest the type of subjective bad faith required to state a claim under the duty imposed by [a Special Approval provision]").

29

#### b.    El Paso Parent's Decision Not To Invest In Gulf LNG

The plaintiffs next attack the Drop-Down based on the contemporaneous transaction involving Gulf LNG. El Paso Parent managed Gulf LNG, held a 50% interest in the entity, and had a right of first refusal on the 30% interest that GE Capital was interested in purchasing. On February 9, 2010, when El Paso Parent sent its opening proposal for the Drop-Down to the members of the GP Board, defendants Sult, Yardley, and Leland knew that GE Capital had proposed to purchase a 30% interest in Gulf LNG for 9.1x EBITDA. El Paso Parent declined to exercise its right of first refusal.

During the negotiation of the Drop-Down, the Conflicts Committee was unaware of the proposed Gulf LNG transaction, the implied EBITDA multiple, and El Paso Parent's decision not to buy at that price. Neither El Paso Parent nor the members of the GP Board who knew about the proposed transaction disclosed its existence or any of the details about the Gulf LNG transaction to the Conflicts Committee.

The plaintiffs contend that El Paso Parent's decision not to acquire an LNG asset at a 9.1x EBITDA multiple while at the same time proposing to sell its own LNG assets to El Paso MLP at a 12.2x EBITDA multiple supports an inference that the Drop-Down was approved in bad faith. The plaintiffs first argue that because El Paso Parent concealed information from the Conflicts Committee, Special Approval for the Drop-Down was not properly obtained. But the subjective good faith of the members of the Conflicts Committee cannot be challenged based on information that the plaintiffs admit the members did not have. The contractual language of the Special Approval provision turns only on the subjective good faith of the Conflicts Committee. It does not address

whether Special Approval is valid if the General Partner withholds information from the Conflicts Committee. That gap in the LP Agreement must be filled, if necessary, by the implied covenant of good faith and fair dealing.

For purposes of the Drop-Down, the plaintiffs fare no better when arguing that the Gulf LNG deal illustrates arm's-length pricing such that the Conflicts Committee's decision to buy LNG assets at a significantly higher EBITDA multiple gives rise to an inference of bad faith. A sufficiently egregious differential in pricing or terms can support an inference of bad faith. *Encore Energy*, 72 A.3d at 107; *see also Gelfman*, 792 A.2d at 990 (holding that terms of conflict-of-interest transaction were sufficiently extreme to support a pleading-stage inference of bad faith).

After negotiation, El Paso MLP paid 11.1x EBITDA in the Drop-Down, which was the highest multiple it had ever paid. If the plaintiffs are correct that the Gulf LNG transaction and the Drop-Down were comparable, then El Paso MLP purchased LNG assets in a self-dealing transaction for 22% more than the price at which El Paso Parent declined to buy from a third party for its own account.

If the Conflicts Committee or its advisors knew about the Gulf LNG data point contemporaneously with the Drop-Down, then the pricing disparity might be sufficient to support an inference of bad faith when evaluated under the current procedural standard. Such a ruling would not mean that the defendants would lose and be held liable, only that a trial would be necessary to resolve a disputed question of fact as to their intent. In this case, however, the plaintiffs admit that the Conflicts Committee did not know about the Gulf LNG data point for purposes of the Drop-Down. That concession is dispositive.

31

### c. Kuehn's Initial Pricing Expectations

The plaintiffs also argue with respect to the Drop-Down that Kuehn came to the conclusion on March 1, 2010, that a fair multiple to pay in the Drop-Down would be 8.5x to 9x EBITDA, well below the 11.1x that El Paso MLP ultimately agreed to pay. Squire Aff. Ex. 25. When Reichstetter opened negotiations with El Paso Parent, he responded to El Paso Parent's offer of 12.2x EBITDA by starting at 10.5x, well above Kuehn's suggested range. The plaintiffs point out that the Conflicts Committee could not have expected to end up in Kuehn's range by starting so far above it.

As with the Conflicts Committee's assessment of the Service Agreements, reasonable minds could disagree over the Conflicts Committee's negotiating strategy, but the strategy was not so extreme that it could support a potential finding of bad faith. Likewise, the fact that El Paso MLP ultimately paid a higher multiple than what Kuehn initially believed appropriate is insufficient to support such a finding. Kuehn's belief reflected his preliminary assessment of value, and he continued his email by noting that "[t]he info in paragraph 1 of Scott's 2/24 email may produce a different result . . . ." *Id.* In arriving at the final transaction price, the Conflicts Committee relied on numerous other factors, including Tudor's analyses.

### d. The Plaintiffs' Expert Reports

The plaintiffs finally attack the good faith of the Conflicts Committee with two expert reports. Neither provides meaningful support for the plaintiffs' claims.

The first report was submitted by Gilbert E. Matthews, who opined that the Conflicts Committee breached the contractual good faith standard established in the LP

Agreement. The Matthews opinion is not entitled to any weight. First, it is an impermissible legal opinion that purports to address the legal issue that the court has been asked to decide. *See In re Walt Disney Co. Deriv. Litig.*, 2004 WL 550750, at \*1 n.3 (Del. Ch. Mar. 9, 2004) (excluding expert report that opined the defendants breached their fiduciary duties and recognizing that "Delaware law requires 'exclusion of expert testimony that expresses a legal opinion'"). Second, Matthews testified that he did not know how the term "good faith" was defined in the LP Agreement. He applied an objective good faith standard, not the subjective good faith standard established in the LP Agreement.

The other expert report came from Zachary Nye. Rather than opining on the issue of good faith, Nye valued the assets that El Paso MLP acquired on the premise that there was "not negligible" risk of counterparty default under the Service Agreements. Nye divided the cash flow streams from Southern LNG and Elba Express into a guaranteed stream and a non-guaranteed stream. He then accounted for the default risk by using option pricing theory to estimate the cost of capital to be applied to the non-guaranteed cash flows. His method makes sense, but it is not an industry standard practice for valuing similar assets. Nye's method might well be theoretically correct, but the failure of the Conflicts Committee and Tudor to invent the same analysis and deploy it does not support a reasonable inference of bad faith.

### e. Summary Judgment On Count I For The Drop-Down

The plaintiffs have not cited record evidence which, when viewed in the light most favorable to the plaintiffs, is sufficient to give rise to a dispute of fact about whether the

33

members of the Conflicts Committee subjectively believed in good faith that the Drop-Down was in the best interests of the Partnership. Summary judgment is therefore granted in favor of the General Partner, as well as the other defendants, on Count I as to the claim that the Drop-Down violated the express requirements of the LP Agreement.

## B.     Breach Of The Implied Terms Of The LP Agreement

In addition to contending that the defendants breached their express contractual obligations under the LP Agreement, Count I of the First Complaint asserts that the defendants violated unwritten obligations supplied by the implied covenant of good faith and fair dealing. Because a claim for breach of the implied covenant of good faith and fair dealing is a claim for breach of contract, the General Partner is the only defendant potentially liable on this claim. *See* Part II.A.1, *supra*. Summary judgment is granted to the General Partner because the plaintiffs have not presented evidence sufficient to support a claim for breach of an implied provision.

### 1.     The Definition Of "Good Faith" Is Not Controlling.

The defendants initially try to defeat the implied covenant claim by arguing that the LP Agreement expressly defines the term "good faith," leaving no room for the implied covenant. According to the defendants, the implied covenant does not apply because the LP Agreement makes "good faith" the standard for evaluating whether the Conflicts Committee validly gave Special Approval and further defines "good faith" as subjective good faith. The defendants argue that when the parties have "agreed how to proceed under a future state of the world" (*i.e.*, in the face of a conflict transaction), their bargain (*i.e.*, the LP Agreement) "naturally controls." *Lonergan v. EPE Hldgs., LLC*,

5 A.3d 1008, 1018 (Del. Ch. 2010). The Delaware Supreme Court has rejected similar arguments. *Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 418 (Del. 2013), *overruled in part on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013); *accord DV Realty Advisors LLC v. Policemen's Annuity and Benefit Fund of Chi.*, 75 A.3d 101, 109 (Del. 2013) (recognizing that the agreement's "contractual duty [of good faith] encompasses a concept of 'good faith' that is different from the good faith concept addressed by the implied covenant of good faith and fair dealing").

The defendants' reliance on the definition of "good faith" misunderstands the implied covenant. The implied covenant is not a free-floating duty that requires good faith conduct in some subjectively appropriate sense. *Gerber*, 67 A.3d at 418. The implied covenant is rather the doctrine by which Delaware law cautiously supplies implied terms to fill gaps in the express provisions of an agreement. Contractual gaps always exist because the human negotiators and drafters lack perfect foresight, operate with limited resources, and practice their craft using the imprecise tool of language.[3] "No

---

[3] An extensive literature elaborates on these basic points. *See, e.g.*, Paul M. Altman & Srinivas M. Raju, *Delaware Alternative Entities and the Implied Contractual Covenant of Good Faith and Fair Dealing Under Delaware Law*, 60 Bus. Law. 1469, 1476 (2005) ("Delaware courts have long recognized the difficulty inherent in contract formation relating to the parties' ability to negotiate and describe within their contract all of the possible provisions that could be included."); Harold Dubroff, *The Implied Covenant of Good Faith in Contract Interpretation and Gap-Filling: Reviling a Revered Relic*, 80 St. John's L. Rev. 559, 576 (2006) ("[C]ourts, whether implicitly or explicitly, and regardless of their jurisprudential philosophy . . . acknowledge the impracticality (due to transaction costs) and the impossibility (due to the limits of human imagination . . . ) of producing an all-encompassing, express agreement."); Ralph James Mooney, *The New Conceptualism in Contract Law*, 74 Or. L. Rev. 1131, 1147 (1995) ("The assumption that most parties in fact reduce their entire agreement to a single, perfectly accurate writing [is] . . . unrealistic.").

matter how skilled, sophisticated, or resourceful, parties will be unable to anticipate and address every possible situation that may develop after their contract is formed."[4]  "And even if it were possible, contracting is costly.  It would be impractical to raise, negotiate, and address every conceivable situation in the express terms of even the most prolix agreement."[5]  Gaps also exist because some aspects of the deal are so obvious to the participants that they never think, or see no need, to address them.  *See Katz v. Oak Indus. Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986) (Allen, C.) ("[P]arties occasionally have understandings or expectations that were so fundamental that they did not need to negotiate about those expectations." (quoting *Corbin on Contracts* § 570, at 601 (Kaufman Supp. 1984)).  Precisely because gaps always exist, the implied covenant is a mandatory, nonwaivable aspect of every contract governed by Delaware law.  *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005).

In this case, the LP Agreement supplies a definition of "good faith" that governs whether the defendants have complied with provisions of the LP Agreement that utilize

---

[4] Mohsen Manesh, *Express Contract Terms and the Implied Contractual Covenant of Delaware Law*, 38 Del. J. Corp. L. 1, 7 (2013) [hereinafter *Implied Contractual Covenant*]; *see, e.g.*, *Sonet*, 722 A.2d at 324 (noting "the rather practical problem of the impossibility of writing contract provisions that incorporate every bell and whistle all at once").

[5] *Implied Contractual Covenant*, *supra*, at 20; *accord Lonergan*, 5 A.3d at 1018 (observing that when contracting, parties will necessarily "fail to address a future state of the world . . . because contracting is costly and human knowledge imperfect"); *Amirsaleh v. Bd. of Trade of City of New York, Inc.*, 2008 WL 4182998, at *1 (Del. Ch. Sept. 11, 2008) ("No contract, regardless of how tightly or precisely drafted it may be, can wholly account for every possible contingency."); *Credit Lyonnais Bank Nederland, N.V. v. Pathe Commc'ns Corp.*, 1991 WL 277613, at *23 (Del. Ch. Dec. 30, 1991) (Allen, C.) ("In only a moderately complex or extend[ed] contractual relationship, the cost of attempting to catalog and negotiate with respect to all possible future states of the world would be prohibitive, if it were cognitively possible.").

that term. The definition is not a means of implying terms to fill contractual gaps, and the implied covenant does not turn on whether the counterparty acted in subjective good faith. *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, 50 A.3d 434, 442, 444 (Del. Ch. 2012) (observing that "[t]here are references in Delaware case law to the implied covenant turning on the breaching party having a culpable mental state," but finding that "[t]he elements of an implied covenant claim remain those of a breach of contract claim" and that "[p]roving a breach of contract claim does not depend on the breaching party's mental state"), *rev'd on other grounds*, 68 A.3d 665 (Del. 2013). The definition of good faith in the agreement does not displace the implied covenant. *DV Realty*, 75 A.3d at 109 ("The LPA's contractual duty encompasses a concept of 'good faith' that is different from the good faith concept addressed by the implied covenant of good faith and fair dealing."); *Gerber*, 67 A.3d at 418 (same).

## 2.     The Application Of The Implied Covenant Standard

The plaintiffs rest their implied covenant claim on the assertion that El Paso Parent "intentionally concealed material information—GE's proposed purchase of 30% of Gulf LNG—that, were it disclosed, should have led [Tudor] to decline to provide a fairness opinion." Pls.' Answering Br. at 59-60. The plaintiffs also claim that the General Partner and Tudor "repeatedly misrepresented" the credit quality of the Service Agreement counterparties to the Conflicts Committee. *Id.* at 60. The plaintiffs conclude that the General Partner "sought and obtained Special Approval in bad faith." *Id.*

When presented with a claim under the implied covenant, the first step in the analysis is to determine whether there is a gap that needs to be filled. Scholars refer to

this step as the process of contract construction, which is distinct from the process of contract interpretation.[6] "Interpretation is the process by which a court resolves ambiguity in the express terms of a contract. . . . By contrast, construction is the process by which a court determines the scope and legal effect of those terms." *Implied Contractual Covenant*, *supra*, at 19 (footnote omitted). Through the process of contract construction, a court determines whether the language of the contract expressly covers a particular issue, in which case the implied covenant will not apply, or whether the contract is silent on the subject, revealing a gap that the implied covenant might fill. *Id.*

A court must first determine whether a gap exists because "[t]he implied covenant will not infer language that contradicts a clear exercise of an express contractual right." *Nemec v. Shrader*, 991 A.2d 1120, 1127 (Del. 2010). "[B]ecause the implied covenant is, by definition, implied, and because it protects the spirit of the agreement rather than the form, it cannot be invoked where the contract itself expressly covers the subject at issue." *Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at *10 (Del. Ch. May 7, 2008). "[I]mplied covenant analysis will only be applied when the contract is truly silent with respect to the matter at hand . . . ." *Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1032 (Del. Ch. 2006).

If a contractual gap exists, then the court must determine whether the implied covenant should be used to supply a term to fill the gap. Not all gaps should be filled.

---

[6] *See Implied Contractual Covenant*, *supra*, at 18; *see also* 5 Margaret N. Kniffin, *Corbin on Contracts* § 24.3 (Joseph M. Perillo ed., rev. ed. 1998); *Williston on Contracts*, *supra*, § 30:1.

The most obvious reason a term would not appear in the parties' express agreement is that the parties simply rejected that term ex ante when they articulated their contractual rights and obligations. Perhaps, for example, the parties . . . considered the term, and perhaps [after] some give-and-take dickering, the parties agreed the term should not be made part of their agreement. They thus rejected the term by purposefully omitting the term.

*Implied Contractual Covenant*, *supra*, at 28 (footnote omitted). Under those circumstances, the implied covenant should not be used to fill the gap with the omitted term. To do so would grant parties "contractual protections that they failed to secure for themselves at the bargaining table." *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 707 (Del. Ch.), *aff'd*, 861 A.2d 1251 (Del. 2004). A court must not use the implied covenant to "rewrite the contract" that a party "now believes to have been a bad deal." *Nemec*, 991 A.2d at 1126. "Parties have a right to enter into good and bad contracts, the law enforces both." *Id.*

But a gap may exist for other reasons:

It may be that, through haste or limited imagination, the parties simply failed to foresee the need for the term and, therefore, never considered to include it. Or it may be that the parties considered the term, but given practical considerations, judged it too remote, unlikely, or otherwise unimportant to warrant raising during negotiations. They instead sensibly focused their attention on the terms they deemed more likely to be significant. Or perhaps the parties, hoping to avoid an unmanageably prolix agreement, thought the term too obvious to articulate—it "goes without saying," they figured—given the other express terms of their agreement.

*Implied Contractual Covenant*, *supra*, at 30 (footnotes omitted). Under these or other circumstances, it may be appropriate to fill a gap using the implied covenant. The Delaware Supreme Court has provided guidance in this area by admonishing against a free-wheeling approach to the implied covenant. Invoking the doctrine is a "cautious

39

enterprise." *Nemec*, 991 A.2d at 1125. Implying contract terms is an "occasional necessity . . . to ensure [that] parties' reasonable expectations are fulfilled." *Dunlap*, 878 A.2d at 442 (internal quotation marks omitted). Its use should be "rare and fact-intensive, turning on issues of compelling fairness." *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del. 1998). A restrictive approach encourages parties to craft agreements carefully and be specific about their commitments, because they cannot be confident that the implied covenant will rescue them later.

Assuming a gap exists and the court determines that it should be filled, then the court must determine how to fill it. At this stage, a reviewing court does not simply introduce its own notions of what would be fair or reasonable under the circumstances. "The implied covenant seeks to enforce the parties' contractual bargain by implying only those terms that the parties would have agreed to during their original negotiations if they had thought to address them." *Gerber*, 67 A.3d at 418. To supply an implicit term, the court "looks to the past" and asks "what the parties would have agreed to themselves had they considered the issue in their original bargaining positions at the time of contracting." *Id.* The court seeks to determine "whether it is clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith—had they thought to negotiate with respect to that matter." *Id.* "Terms are to be implied in a contract not because they are reasonable but because they are necessarily involved in the contractual relationship so that the parties must have intended them and have only failed to express them because they are too obvious to need expression."

40

*Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 1997 WL 525873, at *5 (Del. Ch. Aug. 13, 1997), *aff'd*, 708 A.2d 989 (Del. 1998).

### a. No Implied Duty To Volunteer Information

The first contractual gap in this case is whether the General Partner had an obligation to volunteer information that could be material to the Conflicts Committee's decision to grant Special Approval. The plaintiffs argue that the General Partner should have disclosed to the Conflicts Committee that (i) GE Capital was acquiring 30% of Gulf LNG for 9.1x EBITDA, subject to El Paso Parent's right of first refusal and (ii) El Paso Parent declined to exercise its right of first refusal at that price. The defendants have advanced a number of reasons why the Gulf LNG transaction was not comparable to the Drop-Down, why El Paso Parent declined to exercise its right of first refusal, and why no one disclosed the information to the Conflicts Committee. If a duty to disclose existed, then resolving those arguments would require a trial.

Section 7.9(a) does not require that the General Partner volunteer information to the Conflicts Committee when seeking Special Approval. The LP Agreement does not elsewhere impose any affirmative informational obligations on the General Partner or El Paso Parent. The record suggests that the parties believed that the Conflicts Committee and its advisors could ask for information from the General Partner and El Paso Parent, and both the General Partner and El Paso Parent generally seem to have been responsive. The LP Agreement is silent, however, on what happens without a request. A gap exists.

If the LP Agreement did not eliminate fiduciary duties, then Delaware law would require both the General Partner and El Paso Parent, as controller of the General Partner,

41

to disclose voluntarily to the Conflicts Committee the material information they possessed about the Drop-Down. In the *Atlas Energy* case, this court held that when an LLC agreement had not eliminated the fiduciary duties owed by the entity who controlled the LLC, the minority unitholders stated a claim for breach of fiduciary duty against the controller by alleging, among other things, that the controller withheld material information from a special committee established under a special approval process similar to the one in this case. *Atlas Energy*, 2010 WL 4273122, at *10-11. This default rule of law parallels the obligations owed by a controller in the corporate context.[7] Because the LP Agreement eliminates all fiduciary duties, the fiduciary duty precedents do not control. The question rather is whether the implied covenant gives rise to a similar disclosure obligation.

---

[7] *Kahn v. Tremont Corp. (Tremont I)*, 1996 WL 145452, at *15 (Del. Ch. Mar. 21, 1996) (Allen, C.) ("Generally in order to make a special committee structure work it is necessary that a controlling shareholder disclose fully all the material facts and circumstances surrounding the transaction.") (alteration and internal quotation marks omitted), *rev'd on other grounds*, 694 A.2d 422 (Del. 1997); *accord In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 26-27 (Del. Ch. 2014); *see also Weinberger v. UOP, Inc.*, 457 A.2d 701, 708-09 (Del. 1983) (holding that squeeze-out merger did not satisfy test of entire fairness where officers of parent corporation who served on subsidiary board prepared report on value of subsidiary using subsidiary's information and "it [was] clear from the record that neither [director] shared this report with their fellow directors of [the subsidiary]" and noting that "[s]ince the study was prepared by two UOP directors, using UOP information for the exclusive benefit of Signal, and nothing whatever was done to disclose it to the outside UOP directors or the minority shareholders, a question of breach of fiduciary duty arises"). Even when fiduciary duties apply, there are certain categories of sensitive negotiating information that the controlling stockholder need not share, such as "information disclosing the top price that a proposed buyer would be willing or able to pay, or the lowest price that a proposed seller would accept." *Tremont I*, 1996 WL 145452, at *15; *accord In re Pure Res., Inc., S'holders Litig.*, 808 A.2d 421, 451 (Del. Ch. 2002).

42

When an alternative entity agreement eliminates fiduciary duties as part of a detailed contractual governance scheme, Delaware courts should hesitate to use the implied covenant to reconstruct the outcome that fiduciary duty analysis would have generated.

> Under a fiduciary duty or tort analysis, a court examines the parties as situated at the time of the wrong. The court determines whether the defendant owed the plaintiff a duty, considers the defendant's obligations (if any) in light of that duty, and then evaluates whether the duty was breached. Temporally, each inquiry turns on the parties' relationship as it existed at the time of the wrong.

*Gerber*, 67 A.3d at 418. "Fiduciary duty review empowers courts to determine how a governance scheme should operate under particularized factual circumstances." *Lonergan*, 5 A.3d at 1018. Although the availability of *ex post* fiduciary review inherently produces some degree of uncertainty, "there is good reason to suppose it can be efficient." *Equity-Linked Investors, L.P. v. Adams*, 705 A.2d 1040, 1055 n.48 (Del. Ch. 1997) (Allen, C.).

"The implied covenant is not a substitute for fiduciary duty analysis." *Lonergan*, 5 A.3d at 1017. "When parties exercise the authority provided by the LP Act to eliminate fiduciary duties, they take away the most powerful of a court's remedial and gap-filling powers." *Id.* at 1018.

> [W]hen parties fail to address a future state of the world—and they necessarily will because contracting is costly and human knowledge imperfect—then the elimination of fiduciary duties implies an agreement that losses should remain where they fall. After all, if the parties wanted courts to be in the business of shifting losses after the fact, then they would not have eliminated the most powerful tool for doing so.

*Id.* (footnote omitted). To use the implied covenant to replicate fiduciary review "would vitiate the limited reach of the concept of the implied duty of good faith and fair dealing." *Nemec*, 991 A.2d at 1128; *see In re IAC/InterActive Corp.*, 948 A.2d 471, 507 (Del. Ch. 2008) ("If this court were to rely on the implied covenant of good faith and fair dealing . . . to read in a broad fiduciary obligation, it would undermine the bargain reached by the parties.").

In *Gerber*, in the course of rejecting the defendants' contention that a contractual definition of good faith displaced the implied covenant, the Delaware Supreme Court identified potential Special Approval scenarios that could give rise to an implied covenant breach:

> Examples readily come to mind of cases where a general partner's actions in obtaining a fairness opinion from a qualified financial advisor themselves would be arbitrary or unreasonable, and "thereby frustrat[e] the fruits of the bargain that the asserting party reasonably expected." To suggest one hypothetical example, a qualified financial advisor may be willing to opine that a transaction is fair even though (unbeknownst to the advisor) the controller has intentionally concealed material information that, if disclosed, would require the advisor to opine that the transaction price is in fact not fair.

67 A.3d at 420 (quoting *Nemec*, 991 A.2d at 1126). The "hypothetical example" was not essential to the Delaware Supreme Court's decision. To illustrate the example, the *Gerber* decision cited *In re Emerging Communications, Inc. Shareholders Litigation*, 2004 WL 1305745 (Del. Ch. June 4, 2004), a corporate law fiduciary duty case involving a controlling stockholder squeeze-out that did not implicate the implied covenant of good faith and fair dealing. Notably, the *Gerber* decision never stated that the example necessarily would constitute a breach of the implied covenant, only that the defendants'

position that a contractual definition of good faith dominated the implied covenant "would preclude those claims." 67 A.3d at 421.

"There is no question that, if the Supreme Court has clearly spoken on a question of law necessary to deciding a case before it, this court must follow its answer." *In re MFW S'holders Litig.*, 67 A.3d 496, 520 (Del. Ch. 2013), *aff'd sub nom. Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014). But when an opinion contains judicial statements on issues that "would have no effect on the outcome of [the] case,"[8] those statements are *dictum* and "without precedential effect."[9] The better reading of *Gerber* (at least to me) appears to be that the Delaware Supreme Court identified the implied covenant issue and cited a corporate fiduciary duty case to illustrate the potential reason for concern. *Gerber* does not appear to have held that a failure to volunteer information would always constitute an implied covenant breach. Obviously this is the interpretation of one trial judge, and it may not accurately reflect the Delaware Supreme Court's intent.

Having concluded that the question remains open, this court's task is to determine whether it is clear from what was expressly agreed upon in the LP Agreement that the parties would have agreed to require the General Partner to volunteer material information about other transactions to the Conflicts Committee, had they thought to address that matter. *Gerber*, 67 A.3d at 418. Several factors contribute to the conclusion

---

[8] *Brown v. United Water Del., Inc.*, 3 A.3d 272, 277 (Del. 2010).

[9] *Crown EMAK P'rs, LLC v. Kurz*, 992 A.2d 377, 398 (Del. 2010); *accord United Water*, 3 A.3d at 275, 276 n.17.

that the drafters of the LP Agreement would not have imposed an affirmative obligation on the General Partner to disclose material information about other transactions to the Conflicts Committee.

First, the drafters of the LP Agreement adopted a general approach of using the contractual freedom provided by the Delaware Limited Partnership Act (the "Act") to expand the General Partner's freedom of action and dial back the protections that otherwise would exist if fiduciary duties applied. If the issue of voluntary disclosure had arisen at the time of contracting, then it is reasonable to assume that the drafters would have researched the fiduciary duty precedents, identified the disclosure obligation they imposed, and expressly eliminated it.

Second, the drafters of the LP Agreement did not merely restrict or limit fiduciary duties. They eliminated them, resulting in a fully contractual relationship. In such a relationship, the general rule is that similarly situated counterparties have no duty to speak that would require one party to disclose private information to the other.[10] The LP Agreement provides that the members of the Conflicts Committee would be at least three directors of the General Partner, suggesting that its members would be individuals knowledgeable about El Paso MLP, El Paso Parent, and the oil and gas industry. The LP Agreement contemplates that the Conflicts Committee would retain expert legal and

---

[10] *See generally Laidlaw v. Organ*, 15 U.S. (2 Wheat.) 178 (1817); Restatement (Second) of Contracts § 161 (1981); Michael J. Borden, *Mistake and Disclosure in a Model of Two-Sided Informational Inputs*, 73 Mo. L. Rev. 667 (2008) (surveying and analyzing justifications under contract theory for non-disclosure).

financial advisors with similar knowledge and expertise. The Conflicts Committee therefore would be a sophisticated and similarly situated negotiating adversary for the General Partner. Ordinarily, under those circumstances, one party to the contract would not owe an affirmative duty of disclosure to its counterparty.

Third, as a consequence of eliminating all fiduciary obligations, the LP Agreement eliminated the General Partner's fiduciary duty of disclosure to the limited partners. *See In re K-Sea Transp. P'rs L.P. (K-Sea I)*, 2011 WL 2410395, at *7-8 (Del. Ch. June 10, 2011); *Lonergan*, 5 A.3d at 1023. As explained by corporate precedents, the duty to disclose all material information reasonably available when seeking stockholder action represents "the application in a specific context of the board's fiduciary duties." *Malpiede v. Townson*, 780 A.2d 1075, 1086 (Del. 2001). The duty not to speak falsely that applies whenever directors choose to communicate with stockholders similarly flows from a board's fiduciary duties. *Malone v. Brincat*, 722 A.2d 5, 14 (Del. 1998). The same is true in the limited partnership context: Absent contractual modification, a general partner owes fiduciary duties that include a "duty of full disclosure." *Sussex Life Care Assocs. v. Strickler*, 1988 WL 156833, at *4 (Del. Ch. June 13, 1989) ("There can be no question but that partners owe fiduciary duties to their fellow partners, and this duty has been held to encompass a duty of full disclosure . . . ." (citing *Boxer v. Husky Oil Co.*, 429 A.2d 995 (Del. Ch. 1981))). A limited partner who wishes to assert a disclosure claim therefore "must allege either a fiduciary duty or a contractual duty to disclose." *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *3 (Del. Ch. Aug. 26, 2005). When an alternative entity agreement eliminates all fiduciary duties,

47

then all fiduciary duties have been eliminated. A claim for common law fraud remains, and the alternative entity agreement might well include a contractual duty to disclose specific information or to provide broad categories of information. However, "the implied covenant cannot support a generalized duty to disclose all material information reasonably available." *Lonergan*, 5 A.3d at 1025. The drafters of the LP Agreement eliminated the fiduciary duty of disclosure owed to limited partners. It seems unlikely that the same drafters would expect the General Partner to owe an implicit contractual obligation to volunteer information when negotiating with the Conflicts Committee.

Fourth, the LP Agreement's approach to the corporate opportunity doctrine shows how the drafters handled a common law principle that, absent contractual modification, could require the General Partner to inform El Paso MLP about business opportunities within the Partnership's line of business that the Partnership had the capacity to undertake. Section 7.5(c) states:

> No Indemnitee (including the General Partner) who acquires knowledge of a potential transaction, agreement, arrangement or other matter that may be an opportunity to the Partnership, shall have any duty to communicate or offer such opportunity to the Partnership, and such Indemnitee (including the General Partner) shall not be liable to the Partnership, to any Limited Partner or any other Person for breach of any fiduciary or other duty by reason of the fact that such Indemnitee (including the General Partner) pursues or acquires for itself, directs such opportunity to another Person or does not communicate such opportunity or information to the Partnership; provided such Indemnitee does not engage in such business or activity as a result of or using confidential or proprietary information provided by or on behalf of the Partnership to such Indemnitee.

LPA § 7.5(c). Confronted with a situation where common law fiduciary duties could require the General Partner to disclose information to the Partnership, the LP Agreement

48

specified that the General Partner would not have a duty to communicate the information to the Partnership or liability for failing to do so.

Finally, precedent suggests that if the drafters intended for a disclosure obligation to exist, they would have included specific language. A recent decision by this court interpreted a limited partnership agreement that utilized a similar structure for conflict-of-interest transactions, with four contractual alternatives including Special Approval. *See K-Sea I*, 2011 WL 2410395, at *5. The language authorizing the Special Approval route stated that it would be effective "as long as the material facts known to the General Partner or any of its Affiliates regarding any proposed transaction were disclosed to the Conflicts Committee at the time it gave its approval." *Id.* The inclusion of this condition in the *K-Sea* agreement indicates that without this language, a general partner and its affiliates would not have an obligation to disclose information.[11]

The plaintiffs have not identified countervailing indications that would support an expectation at the time of contracting that the General Partner would have to volunteer information to the Conflicts Committee. Given this confluence of factors, the plaintiffs cannot rely on the implied covenant to fill the gap in the LP Agreement with a mandatory

---

[11] *See Kuroda v. SPJS Hldgs., L.L.C.*, 2010 WL 925853, at *10 (Del. Ch. Mar. 16, 2010) (agreeing that "the implied covenant . . . should not be used as a tool to insert language into an agreement . . . [that the] defendants obviously knew how to employ"); *Airborne Health*, 984 A.2d at 146-47 (observing that a litigant's argument for an implied term was "undercut by the ease with which" the parties could have inserted the terms themselves, especially when the terms were "familiar to any transactional lawyer"); *Corporate Prop. Assocs. 14 Inc. v. CHR Hldg. Corp.*, 2008 WL 963048, at *5 (Del. Ch. Apr. 10, 2008) (dismissing claim seeking to imply a term in stock warrants where "sophisticated parties such as those involved in this transaction know that cash dividends are a dilution technique, . . . and that there are methods for protecting themselves contractually").

disclosure requirement. The gap exists by design to replicate an arm's-length, non-fiduciary negotiation.

### b. No Breach Of The Duty Not To Provide False Information

The second alleged contractual gap in this case is whether the General Partner could intentionally misrepresent facts to the Special Committee. The implied covenant generally prohibits a party from providing false information to its contractual counterparty.

> [E]ven when agreeing to a contractual relationship that either party could terminate at will, parties generally would not grant each other the right to commit fraud. It would be a rare party who, in the original bargaining position, would agree that their counterparty could defraud him. Absent explicit anti-reliance language pursuant to which a sophisticated party knowingly assumes risk, *see RAA Mgmt., LLC v. Savage Sports Hldgs., Inc.*, 45 A.3d 107, 110, 115 (Del. 2012), a court can presume that the question "Can I lie to you?" would have been met with a resounding "No." Proof of fraud therefore violates the implied covenant, not because breach of the implied covenant requires fraud, but because "no fraud" is an implied contractual term.

*ASB Allegiance*, 50 A.3d at 443; *accord id.* at 444 ("Proving fraud thus offers one way of establishing a breach of the implied covenant, but not the only way. Proving fraud represents a specific application of the general implied covenant test, *viz.*, what would the parties have agreed to when bargaining initially?").

Unfortunately for the plaintiffs, the evidence does not support a reasonable inference that El Paso Parent, the General Partner, or Tudor provided information to the Conflicts Committee knowing it was incorrect. As discussed previously, the Conflicts Committee obtained and considered information about the terms of the Service Agreements, the size of the guarantees, and the creditworthiness of the counterparties and

guarantors. Just as the plaintiffs disagree with the Conflicts Committee's assessment of the riskiness of the Service Agreements, the plaintiffs disagree with how El Paso Parent, the General Partner, and Tudor described the information. The plaintiffs have not submitted evidence from which a fact-finder could infer that El Paso Parent, the General Partner, or Tudor provided false information to the Conflicts Committee. Summary judgment on the implied covenant claim is therefore granted in favor of the defendants.

## C.    Secondary Liability

The plaintiffs assert claims for aiding and abetting a breach of contract (Count II) and tortious interference with contract (Count III). Both counts seek to impose secondary liability on other actors for their involvement in the primary wrong asserted in Count I. Because summary judgment has been granted on Count I, there is no underlying wrong to support a claim for secondary liability. Summary judgment is granted on Counts II and III as well.

## III.    CONCLUSION

Summary judgment is granted in favor of all defendants with respect to the March 2010 drop-down transaction. The plaintiffs' cross motion seeking to establish liability as a matter of law is denied.

51