# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

CARLA LACEY, derivatively on behalf of SOUTHERN COPPER CORPORATION,

         Plaintiff,

    v.

GERMÁN LARREA MOTA-VELASCO, ALFREDO CASAR PÉREZ, XAVIER GARCÍA DE QUEVADO TOPETE, LUIS MIGUEL PALOMINO BONILLA, GILBERTO PÉREZALONSO CIFUENTES, CARLOS RUIZ SACRISTÁN, ENRIQUE CASTILLO SÁNCHEZ MEJORADA, EMILIO CARRILLO GAMBOA, ALBERTO DE LA PARRA ZAVALA, LUIS CASTELAZO MORALES, ARMANDO ORTEGA GÓMEZ, DANIEL MUÑIZ QUINTANILLA, JUAN REBOLLEDO GOUT, LUIS TÉLLEZ KUENZLER, AMERICAS MINING CORPORATION, AND GRUPO MÉXICO S.A.B. DE C.V.,

         Defendants,

and

SOUTHERN COPPER CORPORATION,

         Nominal Defendant.

) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )

C.A. No. 2019-0312-SG

**MEMORANDUM OPINION**
Date Submitted: October 23, 2020
Date Decided: February 11, 2021

Peter B. Andrew, Craig J. Springer, and David Sborz, of ANDREWS & SPRINGER LLC, Wilmington, Delaware; OF COUNSEL: Jeremy S. Friedman, Spencer Oster, and David F.E. Tejtel, of FRIEDMAN OSTER & TEJTEL PLLC, Bedford Hills, New York, *Attorneys for Plaintiff Carla Lacey*.

William M. Lafferty, John P. DiTomo, and Elizabeth A. Mullin, of MORRIS, NICHOLS, ARSHT, & TUNNEL LLP, Wilmington, Delaware; OF COUNSEL: Bradley J. Benoit and Bryan Dumesnil, of BRACEWELL LLP, Houston, Texas, and Ralph D. McBride, Houston, Texas, *Attorneys for Defendants Germán Larrea Mota-Velasco, Oscar González Rocha, Alfredo Casar Pérez, Xavier García de Quevedo Topete, Alberto de la Parra Zavala, Luis Castelazo Morales, Armando Ortega Gómez, Daniel Muñiz Quintanilla, Juan Rebolledo Gout, and Southern Copper Corporation*.

Srinivas M. Raju, Andrew J. Peach, Matthew W. Murphy, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; OF COUNSEL: Steven R. Selsberg, of S. SELSBERG LAW, PLLC, Houston, Texas, and Sylvia A. Mayer, of S. MAYER LAW PLLC, Houston, Texas, *Attorneys for Defendants Emilio Carrillo Gamboa, Luis Miguel Palomino Bonilla, Gilberto Pérezalonso Cifuentes, Carlos Ruiz Sacristán, Luis Téllez Kuenzler, and Enrique Castillo Sánchez Mejorada*.

Peter J. Walsh, Jr., Matthew F. Davis, and Elizabeth M. Taylor, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; OF COUNSEL: Robert J. Giuffra, Jr., David M.J. Rein, Matthew A. Peller, and Y. Carson Zhou, of SULLIVAN & CROMWELL LLP, New York, New York, *Attorneys for Defendant Americas Mining Corporation*.

GLASSCOCK, Vice Chancellor

This derivative action seeks to hold fiduciaries liable for a series of conflicted transactions involving Southern Copper Corporation ("Southern Copper" or the "Company") and entities related to its controllers. It is brought by a stockholder, who points out that the corporate charter requires transactions between Southern Copper and its controllers be approved by an independent committee of directors. The Amended Complaint alleges that the transactions at issue went forward without such approval and were unfair to the company. The Plaintiff seeks damages on behalf of Southern Copper.

The Defendants—the defendant directors and the controlling entities—moved to dismiss. In previous decisions, I denied the defendant directors' Motion to Dismiss with respect to the Plaintiff's allegations of breach of fiduciary duty,[1] and dismissed one entity, Grupo México S.A.B de C.V. ("Grupo México"), for lack of personal jurisdiction.[2] This brief Memorandum Opinion addresses the remaining allegations against the defendant directors—that the directors breached a contractual duty to comply with the command of Southern Copper's charter, which required certain conflicted transactions be blessed by an independent committee. These are the same allegations that I found supported a claim of *breach of fiduciary duty*

---

[1] *See* Tr. of July 16, 2020 Telephonic Partial Bench Ruling, Dkt. No. 93 [hereinafter the "Bench Ruling"]. The Bench Ruling resolved the defendant directors' Motion to Dismiss generally with respect to Rule 23.1, and I here consider only the motion with respect to Rule 12(b)(6).
[2] *Lacey v. Mota-Velasco*, 2020 WL 5902590 (Del. Ch. Oct. 6, 2020) [hereinafter *Lacey I*].

1

against the defendant directors. While a corporate charter operates in some respects as part of a contractual arrangement among the stockholders and the corporation and its board, the entity and its directors are not contractually bound to one another by the charter—they are not counter-parties—and the legal compulsion for directors to comply with the charter arises as part of their fiduciary duties, and not in contract. Therefore, the defendant directors' Motion to Dismiss the contractual claim is granted.

Additionally, I consider the Motion to Dismiss of Americas Mining Corporation ("AMC"), a Delaware corporation wholly-owned by Grupo México. AMC, in turn, owns a majority of Southern Copper stock. As a controller, AMC owes fiduciary duties where it commandeers the governance of the entity in its own behalf. With respect to one category of transactions at issue, AMC is pled to have stood on both sides. The Amended Complaint alleges that that transaction was unfair. AMC's Motion, I find, must be denied with respect to that category of transactions. Otherwise, the Amended Complaint fails to state a claim against AMC.

My reasoning follows.

2

## I. Background[3]

### A. *The Parties*

The Plaintiff, Carla Lacey, is and has been, at all relevant times, a holder of Southern Copper common stock.[4]

Nominal defendant Southern Copper is a Delaware corporation with its headquarters in Phoenix, Arizona.[5] It operates mining, smelting, and refining facilities in Mexico and Peru that produce copper and other minerals.[6]

Defendant AMC is a Delaware corporation that has been, at all times relevant to this action, a majority stockholder of nominal defendant Southern Copper.[7] AMC is wholly-owned by Grupo México and also owns 100% of Asarco, LLC ("Asarco").[8] Neither Grupo México nor Asarco are parties to this action but each is party to several of the transactions challenged in the Amended Complaint.

Defendant Germán Larrea Mota-Velasco ("Germán Larrea") has served as Chairman of Southern Copper's board of directors (the "Board") since 1999 and was Southern Copper's Chief Executive Officer ("CEO") from December 1999 to

---

[3] Except where otherwise noted, facts referenced here are drawn from the Plaintiff's Verified Amended Derivative Complaint ("Am. Compl." or the "Amended Complaint"). *See generally* Am. Compl., Dkt. No. 49.

[4] Am. Compl. ¶ 7.

[5] *Id.* ¶ 8.

[6] *Id.*

[7] *Id.* ¶ 30.

[8] *See, e.g., id.* ¶¶ 5, 31.

October 2004.[9] In addition, Germán Larrea has been Chairman, President, and CEO of Grupo México since 1994, and controls a majority of the votes of the capital stock of Grupo México.[10]

Defendant Oscar Gonzáles Rocha ("Gonzáles Rocha") has served as a member of Southern Copper's Board since November 1999, as President of Southern Copper since December 1999, as General Director and Chief Operating Officer ("COO") from December 1999 to October 2004, and as CEO since October 2004.[11] Gonzáles Rocha is also CEO and a director of Asarco and President and CEO of AMC.[12]

Defendant Alfredo Casar Pérez ("Casar Pérez") has served as a member of Southern Copper's Board since October 2006.[13]

Defendant Xavier García de Quevado Topete ("García de Quevado") has served as a member of Southern Copper's Board since November 1999[14] and served as COO from April 2005 to April 2015.[15]

Defendant Luis Miguel Palomino Bonilla ("Palomino") has served as a member of Southern Copper's Board since March 2004.[16] Palomino has also served

---

[9] *Id.* ¶¶ 9–10.
[10] *Id.* ¶ 9.
[11] *Id.* ¶ 11.
[12] *Id.*
[13] *Id.* ¶ 12.
[14] *Id.* ¶ 13.
[15] *Id.*
[16] *Id.* ¶ 15.

as a member of the audit committee of Southern Copper (the "Audit Committee") since March 2004.[17]

Defendant Gilberto Pérezalonso Cifuentes ("Pérezalonso") has served as a member of Southern Copper's Board since June 2002, during which time he has also been a member of the Audit Committeee.[18]

Defendant Carlos Ruiz Sacristán ("Ruiz Sacristán") has served as a member of Southern Copper's Board since February 2004.[19] He also served as Chairman of the board of Asarco from 2005 until 2010.[20]

Defendant Enrique Castillo Sánchez Mejorada (Castillo Sánchez Mejorada) has served as a member of Southern Copper's Board since 2010.[21] Since 2013, Castillo Sánchez Mejorada has also served as a member of the Audit Committee.[22]

Defendant Emilio Carrillo Gamboa ("Carillo Gamboa") served as a member of Southern Copper's Board from May 2003 until April 2018.[23] He also served as a member of the Audit Committee during this time.[24]

---

[17] *Id.* As discussed further below, the Audit Committee was responsible for reviewing related-party transactions. *Id.* ¶ 46.
[18] *Id.* ¶ 16.
[19] *Id.* ¶ 18.
[20] *Id.*
[21] *Id.* ¶ 20.
[22] *Id.*
[23] *Id.* ¶ 22.
[24] *Id.*

Director Alberto de la Parra Zavala ("de la Parra") served as a member of Southern Copper's Board from July 2007 to April 2013.[25]

Defendant Luis Castelazo Morales ("Castelazo Morales") served as a member of Southern Copper's Board from September 2010 to June 2016.[26]

Defendant Armando Ortega Gómez ("Ortega Gómez") served as a member of Southern Copper's Board from February 2005 to October 2010.[27] He also served as Southern Copper's General Counsel, "Vice President, Legal," and Secretary from April 2002 until October 2010.[28]

Defendant Daniel Muñiz Quintanilla ("Muñiz") served as a member of Southern Copper's Board from May 2008 to July 2018, and as Executive Vice President from April 2016 to July 2018.[29]

Defendant Juan Rebolledo Gout ("Rebolledo") served as a member of Southern Copper's Board from May 2003 to September 30, 2015.[30]

Defendant Luiz Téllez Kuenzler ("Téllez") served as a member of Southern Copper's Board from March 2010 to April 2011.[31]

---

[25] *Id.* ¶ 24.
[26] *Id.* ¶ 25.
[27] *Id.* ¶ 26.
[28] *Id.*
[29] *Id.* ¶ 27.
[30] *Id.* ¶ 28.
[31] *Id.* ¶ 29.

Defendants Germán Larrea, Gonzáles Rocha, Casar Pérez, García de Quevado, Palomino, Pérezalonso, Ruiz Sacristán, Castillo Sánchez Mejorada, Carillo Gamboa, de la Parra, Castelazo Morales, Ortega Gómez, Muñiz, Rebolledo, and Téllez are referred to collectively herein as the "Director Defendants."

## B. *Relevant Facts*[32]

### 1. *Southern Copper's Charter*

Southern Copper's Charter (the "Charter") was enacted in 1995 and restated in 2005.[33] Article Nine of the Charter ("Article Nine") as restated prohibits Southern Copper from entering into transactions involving consideration in excess of $10,000,000 with Grupo México or any of its affiliates without prior review by a committee of independent Southern Copper directors.[34] The Director Defendants

---

[32] The facts, which originate with the Amended Complaint and the documents referenced therein, are repeated from, and set out in more detail in, my Memorandum Opinion of October 6, 2020. *See generally Lacey I.*

[33] *Id.* ¶ 45.

[34] *Id.* Article Nine of Southern Copper's Charter states the following: "[Southern Copper] shall not engage in any Material Affiliate Transaction unless it has been the subject of prior review by a committee of the Board of Directors with at least three members, each of whom is an Independent Director. . . . [A] 'Material Affiliate Transaction' shall mean any transaction, business dealing or material financial interest in any transaction, or any series of related transactions, between Grupo México or one of its affiliates (other than [Southern Copper] or any of [Southern Copper's] subsidiaries), on the one hand, and [Southern Copper] or one of [Southern Copper's] subsidiaries, on the other hand, that involves consideration of more than $10,000,000 in the aggregate." *Id.*

were aware of these requirements and approved public filings which detailed the Board's obligations under Article Nine each year from 2005 through 2016.[35]

## 2. *The Challenged Transactions*

The Plaintiff identifies several material related-party transactions that were not subject to prior review by a committee of independent Southern Copper directors as required by Article Nine. These violations came to light during a prior litigation filed in this Court in 2015 (the "Power Plant Litigation").[36] During the course of discovery in that case, Southern Copper identified dozens of related-party transactions since January 2004, all but one of which were not subjected to the prior review required by Article Nine.[37] A subset of those transactions make up those discussed here (the "Challenged Transactions"). Each of the Challenged Transactions allegedly had a value greater than $10 million, were not independently reviewed as required by Article Nine, and were unfair to Southern Copper or one of its subsidiaries. To the extent they are relevant to each of the motions to dismiss, I briefly recount the details of those transactions below.

---

[35] *Id.* ¶ 46. For example, each of Southern Copper's Schedule 14A forms filed from 2007 to 2016 state that "[t]he Company is prohibited from entering or continuing a material related party transaction that has not been reviewed and approved by the Audit Committee." *Id.*

[36] *See id.* ¶¶ 4, 49.

[37] *Id.* ¶ 53. The one transaction that did receive prior independent review was the subject of *In re S. Peru Copper Corp. S'holder Deriv. Litig.*, 52 A.3d 761 (Del. Ch. 2011), in which then-Chancellor Strine found that AMC- and Grupo México-affiliated directors had breached their fiduciary duties to Southern Copper. *Id.*

8

a)    *The Buenavista del Cobre Tailings Dam*

The first of the Challenged Transactions concerns the contract awarded to Grupo México subsidiary México Compañía Constructora, S.A. de C.V. ("MCC") for the construction of a new dam to contain mineral processing runoff at the Buenavista copper mine.  Construction of this dam would consist of three phases, roughly (1) construction; (2) expansion; and (3) long-term maintenance.[38]

Southern Copper subsidiary Minera México, S.A. de C.V. ("Minera") conducted a private bidding process for the first phase at the end of 2013.[39]  MCC's bid of $44.1 million was the lowest and MCC was awarded the contract.[40]  That same day, MCC was also awarded the contract for the second phase, worth $156.5 million, without another bidding process.[41]  Per the Amended Complaint, the bidding process was manipulated by Minera to ensure that MCC would receive the contracts.[42]  The resulting contracts were not the product of arms-length negotiation or bargaining, imposed a disproportionate amount of risk on Minera and, by extension, were unfair to Southern Copper, and failed to comply with Article Nine.[43]

---

[38] *Id.* ¶ 57.
[39] *Id.* ¶ 58.
[40] *Id.* ¶ 58.  The next lowest bid was $69.5 million.  *Id.*
[41] *Id.* ¶ 59.
[42] *Id.* ¶¶ 58, 62–64.
[43] *Id.* ¶¶ 59–71.

b) *Phase 2 La Caridad Tailings Dam*

In 2010, the same Grupo México subsidiary, MCC, was also awarded a contract to reinforce part of a different dam by Southern Copper subsidiary Mexicana del Cobre, S.A. de C.V. ("Cobre").[44] Like the contracts awarded to MCC at the Buenavista mine, this contract was allegedly not the product of arms-length negotiation or bargaining, imposed a disproportionate amount of risk on Cobre and, by extension, was unfair to Southern Copper, and failed to comply with Article Nine.[45]

c) *Former IMMSA Metallurgical Complex*

Also in 2010, Southern Copper subsidiary Industrial Minera México, S.A. de C.V. ("IMMSA") awarded MCC a contract to dismantle and remove a former metallurgical complex so that the area could be remediated for a non-industrial use.[46] In 2013, IMMSA awarded MCC a contract to remediate the soil at that site as well.[47] Both contracts were directly awarded without a competitive bidding process, despite MCC's lack of expertise in these areas.[48] Like the other Challenged Transactions, the IMMSA contracts were not the product of arms-length negotiation or bargaining,

---

[44] *Id.* ¶ 73.
[45] *See id.* ¶¶ 74–78.
[46] *Id.* ¶ 80.
[47] *Id.*
[48] The IMMSA remediation contract was MCC's first soil remediation project. *Id.*

were unfair to IMMSA and Southern Copper, and failed to comply with Article Nine.[49]

### d) *The Minerals Contracts*

Between 2010 and 2017, various Southern Copper subsidiaries entered into several contracts with Asarco, AMC's wholly-owned subsidiary, for the purchase and sale of raw materials used in copper production.[50] In the aggregate, these contracts were worth $700 million.[51] These transactions were not the product of arms-length negotiations and, per the Amended Complaint, were orchestrated by Grupo México to "prop up struggling Asarco," were unfair to Southern Copper, and violated Article Nine.[52]

### e) *The Transportation Contracts*

Certain Southern Copper subsidiaries contract with Grupo México subsidiary Grupo Ferroviario Mexicano, S.A. de C.V. ("Ferromex")[53] for use of Grupo México's rail lines, which account for over 57% of the available rail lines in

---

[49] *See id.* ¶¶ 83–90.
[50] *Id.* ¶ 92. The Southern Copper subsidiaries involved include Cobre, Operadora de Minas e Instalaciones Mineras, S.A. de C.V., and Metalurgical del Cobre, S.A. de C.V. *See id.* ¶¶ 92, 92 n.53, 98.
[51] *See id.* ¶¶ 95, 98.
[52] *Id.* ¶¶ 95–100. For example, Southern Copper charged Asarco between 20% and 45% less for copper cathodes than comparable companies in the North American region. *Id.* ¶ 97. Similarly, Southern Copper purchased anodic slimes and copper concentrates from Asarco, despite manufacturing these materials itself, allegedly to clear inventory and boost sales for Asarco. *Id.* ¶¶ 99–100.
[53] The Defendants refer to this entity in their Opening Brief as "Ferrocarril Mexicano, S.A. de C.V." *See* Opening Br. of Grupo México S.A.B. de C.V. and Americas Mining Corp. 11, Dkt. No. 67 [hereinafter AMC Opening Br.].

11

Mexico.[54] Ferromex uses its monopolistic power to set unfairly high tariffs for transportation services without negotiation, making truck transportation over the same route between 5% and 15% cheaper than rail.[55] Southern Copper subsidiaries also contracted with Ferromex to finance improvements to these rail lines by gradually increasing tariffs over three years.[56] Per the Amended Complaint, these contracts are the result of a lack of arms-length negotiation and breaches of fiduciary duty by the Defendants and did not comply with Article Nine.[57]

f)      *The Support Services Agreements*

Lastly, the Plaintiff alleges that Grupo México and Southern Copper are parties to an administrative support services contract (or multiple contracts) whereby Southern Copper directly pays Grupo México $13.8 million per year in fees.[58] These "Support Services Agreements" allegedly unfairly overcharge Southern Copper and do not comply with Article Nine.[59]

---

[54] Am. Compl. ¶ 101.
[55] *Id.* ¶ 104.
[56] *Id.* ¶¶ 106–107, 106 n.59. The Amended Complaint notes that, pursuant to another contract, Ferromex and various Southern Copper subsidiaries should have shared the cost of this investment. *Id.* ¶ 106.
[57] *Id.* ¶¶ 101–02, 107.
[58] *Id.* ¶ 108. Each of Southern Copper's securities filings from 2005 to 2017 contains substantively the same disclosure: "Grupo México, the Company's ultimate parent and the majority indirect stockholder of the Company and its affiliates, provides various services to the Company. In 2015, these activities were principally related to accounting, legal, tax, financial, treasury, human resources, price risk and hedging, purchasing, procurement and logistics, sales and administrative and other support services. We pay Grupo México for these services. The total amount paid by us to Grupo México for such services in 2015 was $13.8 million. We expect to continue to pay for these support services in the future." *See id.* ¶ 108, n.60.
[59] *Id.* ¶¶ 108–11.

### 3. *Southern Copper's Audit Committee Review*

While the Power Plant Litigation was ongoing, Southern Copper's Audit Committee formed a subcommittee of outside directors to review certain past transactions that may have failed to comply with Article Nine.[60] This subcommittee retained KPMG Cardenas Dosal, S.C. ("KPMG") and EY México ("EY") to evaluate the reasonableness of pricing in related-party transactions identified by Southern Copper and its directors in the Power Plant Litigation.[61] These consultants issued final reports in 2018 that found little fault with the pricing of the past transactions, but recommended a variety of corporate governance improvements for Southern Copper to implement in the future.[62] Their recommendations included, among other suggestions, implementing transfer pricing and benchmarking assessments, requiring competitive bidding processes for construction contracts, better documenting related-party transactions, and ensuring that an independent committee review future related-party contracts—as already required by Article Nine of the Charter.[63]

---

[60] *Id.* ¶ 112.
[61] *Id.* ¶ 113.
[62] *Id.* ¶ 114.
[63] *See id.* ¶¶ 115–18.

C.    *Procedural History*

The Plaintiff filed the Amended Complaint on October 25, 2019, adding AMC as a defendant.[64]  The Amended Complaint alleges breach of contract and breach of fiduciary duty on the part of the Director Defendants, and breach of fiduciary duty on the part of AMC, Grupo México, and German Larrea (the "Controllers").  I heard oral argument on all defendants' motions to dismiss on June 18, 2020.  On July 16, 2020, I delivered a telephonic bench ruling denying the Director Defendants' Motion to Dismiss with respect to breach of fiduciary duty, and took the remaining motions under consideration as of that date.[65]  On October 6, 2020, I delivered a Memorandum Opinion on Grupo México's Motion to Dismiss for lack of personal jurisdiction.[66]  This opinion addresses the Plaintiff's remaining allegations of breach of contract by the Director Defendants and breach of fiduciary duty by AMC.

II.    **Analysis**

A.    *Applicable Legal Standard*

The Defendants have moved to dismiss this Action pursuant to Chancery Court Rule 12(b)(6).[67]  The standard of review for a Rule 12(b)(6) motion is well settled:

---

[64] *See generally id.*
[65] *See* Bench Ruling.
[66] *See generally Lacey I.*
[67] Ch. Ct. R. 12(b)(6).  *See* n.1, *supra.*

(i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the nonmoving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[68]

When reviewing a motion to dismiss, the Court may take into consideration documents incorporated into the pleadings by reference and judicially noticeable facts available in public SEC filings.[69]

B.  *Breach of Contract*

In a prior Bench Ruling, I denied the Director Defendants' Motion to Dismiss the claims against them for breach of fiduciary duty, based upon the allegations that they were aware of the directives of Article Nine (requiring that an independent committee approve certain conflicted transactions) and knowingly failed to cause the Company to comply.[70]  The Plaintiff's derivative breach of contract claim is premised on the theory that the directors can be liable in damages to Southern Copper itself, for Southern Copper's same failure to abide by the Charter, under a theory of breach of contract.

Article Nine provides that "[Southern Copper] shall not engage in any Material Affiliate Transaction unless it has been the subject of prior review by a

---

[68] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes and internal quotation marks omitted).
[69] *Reith v. Lichtenstein*, 2019 WL 2714065, at *1 (Del. Ch. June 28, 2019).
[70] *See* Bench Ruling.

committee of the Board of Directors with at least three members, each of whom is an Independent Director."[71] Article Nine is presumably included in the Charter as a specific protection for Southern Copper against entry of unfair contracts with its controllers, of the type alleged here. The Director Defendants failed to ensure compliance with the Charter. I have already found that if they did so in intentional disregard of the obligations in the Charter, as adequately alleged in the Amended Complaint, they have acted in bad faith, and are thus liable to Southern Copper. Can the Company also bring (derivatively) a *breach of contract* action against the same Defendants for failing to implement the Charter?

The answer lies in examining whether a contract claim has, in fact, been stated. Breach of contract requires a contract binding the defendant, a breach of the contract by the defendant, and resulting damages.[72] A certificate of incorporation (such as the Charter in question) is, foremost, an agreement by the chartering authority (here, the State of Delaware) and the entity, allowing the corporation to exist and to order its own affairs, to the extent consistent with the DGCL, which forms a part of every certificate of incorporation for a Delaware entity.[73] That the DGCL together with the private ordering created by the certificate of incorporation

---

[71] Am. Compl. ¶ 45.
[72] *See, e.g.*, *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003); *Lyons Ins. Agency, Inc. v. Wark*, 2020 WL 429114, at *4 (Del. Ch. Jan. 28, 2020).
[73] 8 *Del. C.* § 102(b)(1).

16

are the precepts within which the corporation operates is axiomatic, as is the fact that the corporate board directs the company in its discretion, within, however, the framework of the DGCL, the certificate, and the corporate by-laws.[74] Stockholders acquire stock, presumably, in reliance on this understanding; therefore, a corporate charter is appropriately viewed as an agreement among stockholders, the corporation, and the directors. It is useful, therefore, to look at the precepts of the Charter as contractual rights,[75] and to consider direct actions by stockholders against the corporation, alleging violation of the Charter, as actions in contract.[76] For these reasons, our Supreme Court has recognized that charters and bylaws, within the framework of the DGCL, represent contractual arrangements between corporations and stockholders and may bind fiduciaries as well.[77] Stockholders, therefore, may

---

[74] *See, e.g.*, *Ark. Teacher Ret. Sys. v. Alon USA Energy Inc.*, 2019 WL 2714331, at *13 n.65 (Del. Ch. June 28, 2019) (noting that "the DGCL, the certificate of incorporation, and the bylaws together constitute a multi-party contract among the directors, officers, and stockholders of the corporation").

[75] *See Juul Labs, Inc. v. Grove*, 2020 WL 4691916, at *6 n.7 (Del. Ch. Aug. 13, 2020) ("[N]otwithstanding scholarly approaches such as the widely embraced view of the corporation as a nexus of contracts (which I too regard as a helpful metaphor), the DGCL rests on a concept of the corporation that is grounded in a sovereign exercise of state authority: the chartering of a "body corporate" that comes into existence on the date on which a certificate of incorporation becomes effective.").

[76] *E.g. Lions Gate Entertainment Corp. v. Image Entertainment Inc.*, 2006 WL 4782450 (Del. Ch. June 5, 2006) (charter provisions construed according to contract principles).

[77] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012); *see also Airgas, Inc. v. Air Prods. & Chems., Inc.*, 8 A.3d 1182, 1188 (Del. 2010) ("Corporate charters and bylaws are contracts among a corporation's shareholders."); *Blackrock Credit Allocation Income Tr. v. Saba Capital Master Fund*, Ltd., 224 A.3d 964, 977 (Del. 2020) (affirming that corporate bylaws "constitute part of a binding broader contract among the directors, officers and stockholders formed within the statutory framework of the [DGCL]"); *Ark. Teacher Ret. Sys.*, 2019 WL 2714331, at *13 n.65.

bring direct actions in contract against their corporation based on breach of the charter. The question here is otherwise, however. May the corporation (derivatively) bring an action for damages in contract against its directors for allowing the corporation to violate a provision of its charter? I find that the Director Defendants are not counterparties to Southern Copper with respect to the contractual nexus that is the Charter, the by-laws and the DGCL. It is, in fact, Southern Copper, acting through the board, that has failed to follow the Charter, and the Company—directly or derivatively—does not itself have a claim against the directors for breach of contract. It is fundamental that directors are not subject to a contract simply because it binds the corporation,[78] and no facts superseding this axiom are pled in the Amended Complaint here. A board's failure to cause the corporation to comply with its charter, standing alone, does not create a chose-in-action on the part of the corporation against the directors sounding in contract, although it may well create a breach of fiduciary duty claim.

The Amended Complaint does not plead any facts indicating that the Director Defendants are bound to the Company contractually, aside from pointing to the existence of the Charter itself. The relationship between directors and their corporation is typically fiduciary, rather than contractual,[79] and if any claim is

---

[78] *MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at *10–11 (Del. Ch. May 5, 2010).
[79] *See Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989).

created *on behalf of the corporation* by a failure on the part of directors to comply with the entity's formative documents, it is a claim for *breach of fiduciary duty*. Consequently, the claim the Plaintiff seeks to bring here, that the Director Defendants failed to ensure that the Charter was complied with, sounds in fiduciary duty, not contract.[80]

The Plaintiff points to no case vindicating a company's damages action for breach of contract, brought against directors solely for failure to comply with the corporate charter. The Plaintiff cites *Blue Chip Capital,*[81] for example, but that case involved a direct action against the corporation and its directors by a preferred stockholder, and not a derivative action on behalf of the corporation. The complaint in that case, moreover, states breach of contract claims against *the company*, while the claims brought against the directors were fiduciary claims.[82] The Plaintiff also cites *Gale v. Bershad,*[83] but, again, that case involved the explicitly contractual rights of preferred stockholders. *Gale* was a direct action against the company and directors, not an action on behalf of the company itself against its directors.

---

[80] If the Director Defendants were bound to comply with the Charter in contract, presumably the fiduciary duty claim would be redundant, and subject to dismissal, in vindication of the primacy of contract. *See Gale v. Bershad*, 1998 WL 118022, at *5 (Del. Ch. May 30, 1997).

[81] 960 A.2d 827 (Del. Ch. 2006).

[82] *See e.g., id.* at 838.

[83] 1998 WL 118022 (Del. Ch. May 30, 1997).

*Tyson Foods* is similarly inapplicable.[84]  That case was brought (in part) by stockholders to enforce contract rights arising *outside* of the corporate formative documents.[85]  The breach of contract claim alleged in *Tyson* arose from settlement of a prior action in which the individual directors were defendants.[86]  The directors were, presumably, parties to the settlement agreement.  The Court there noted that the stockholders (together with the company and defendant directors) had "agreed to a settlement that provided them with protection from future abuse through the oversight of independent directors.  If Tyson's directors instead chose to delegate their contractual duties to others, they did so *against the terms of the agreement* and at their own peril."[87]  The Court concluded that the plaintiffs had "put forward facts to suggest that the defendant directors had "breached their contract made with shareholders in [the settlement]."[88]  The rationale in *Tyson Foods* does not support a finding that the Plaintiff here has adequately stated a claim derivatively, in contract, against the Director Defendants for breaching Southern Copper's Charter.[89]

---

[84] *In re Tyson Foods, Inc.*, 919 A.2d 563 (Del. Ch. 2007).
[85] *See generally id.*
[86] *Id.* at 599.
[87] *Id.* at 601 (emphasis added).
[88] *Id.* at 600.
[89] Similarly, the other cases cited by the Plaintiff do not involve derivative actions for damages against directors for breach of contract.  *See Blackrock Credit Allocation Income Tr. v. Saba Capital Master Fund*, Ltd., 224 A.3d 964, 976–978 (Del. 2020) (applying contract interpretation principles to trust bylaws in a direct action for injunctive relief); *Hill Int'l, Inc. v. Opportunity Partners L.P.*, 119 A.3d 30, 38 (Del. 2015) (interpreting corporate bylaws in a direct action for injunctive relief); *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012) (affirming

This holding is in no way inconsistent with the idea that a corporate charter is part of a contractual relationship that binds the corporation, its stockholders, and its fiduciaries.[90] The charter—consistent with the DGCL—provides the contours of rights owed to a corporation's stockholders, but fiduciary duties are the legal framework in which those rights are enforced on behalf of the corporation in an action for damages against the directors.

This is true as a matter of contract, for the reasons above. It is also compelling as policy. Directors are elected—hired—by the stockholders to run the corporation. Their duties require that they act on the corporation's behalf without gross negligence or disloyalty. Breach of contract, by contrast, employs an objective standard: again, the elements are a contract, a breach of a duty imposed by that

---

summary judgment against stockholders in a direct action against the corporation for breach of contract); *Airgas, Inc. v. Air Prods. & Chems., Inc.*, 8 A.3d 1182, 1188 (Del. 2010) (applying contract interpretation principles to determine whether bylaws conflicted with charter provision in action for declaratory relief); *Ark. Teacher Ret. Sys. v. Alon USA Energy Inc.*, 2019 WL 2714331, at *13 n.65 (Del. Ch. June 28, 2019) (granting in part motion to dismiss with respect to allegation that directors breached a stockholders agreement to which they were not parties); *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1050 (Del. Ch. 2015) (acknowledging stockholders right to "sue directly to enforce contractual constraints on a board's authority under the charter, bylaws, and provisions of the DGCL."); *Allen v. El Paso Pipeline GP Co.*, 90 A.3d 1097, 1107–08 (Del. Ch. 2014) (discussing the right of stockholders to sue directly in contract); *see also In re Tyson Foods, Inc.*, 919 A.2d 563, 573–74, 598–601 (Del. Ch. 2007); *Blue Chip Capital Fund II Ltd. Partnership v. Tubergen*, 960 A.2d 827 (Del. Ch. 2006); *Gale v. Bershad*, 1998 WL 118022, at *1, *3 (Del. Ch. Mar. 4, 1998).
[90] *See In re Activision Blizzard*, 124 A.3d at 1050; *Allen v. El Paso*, 90 A.3d at 1107–08; *Blackrock Credit Allocation Income Trust v. Saba Capital Master Fund, Ltd.*, 224 A.3d at 977; *Ark. Teacher Ret. Sys.*, 2019 WL 2714331, at *13 n.65.

contract, and damages.[91]  The efforts defendants made to avoid breach, and the entire state of mind of the breaching party, are not consideration in an action for contractual breach—in that sense, liability for failure to comply with a contract is strict.  Such a liability scheme is inimical to the standards set out above, loyalty and care.  Moreover, Southern Copper has an exculpatory clause for breaches of the duty of care, consistent with 8 *Del. C.* § 102(b)(7).[92]  Treating a corporation's charter as a contract between the directors and the corporation opens the door to director liability, strictly, for violations of corporate charters.  By enacting 8 *Del. C.* § 102(b)(7), the Delaware General Assembly explicitly permitted corporations to forgo damages for all but the most egregious violations of a director's fiduciary duties.  Exposing directors to contractual liability for the violation of a charter provision contradicts that purpose.

It is, of course, the case that a director who knowingly causes the company to violate its charter to the detriment of the company and its stockholders acts in bad faith.[93]  Bad faith actions breach that director's duty of loyalty; that action sounds in breach of fiduciary duty, not contract.  That is the situation alleged here.

---

[91] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003); *Lyons Ins. Agency, Inc. v. Wark*, 2020 WL 429114, at *4 (Del. Ch. Jan. 28, 2020).

[92] *See* Transmittal Aff. of Elizabeth M. Taylor to AMC Opening Br., Ex. 5, Dkt. No. 67.

[93] *Stone v. Ritter,* 911 A.2d 362, 370 (Del. 2006) (noting that directors can breach their duty to discharge their fiduciary obligations in good faith by "fail[ing] to act in the face of a known duty to act").

22

Accordingly, I find that the Director Defendants are not liable in contract to Southern Copper for breach of the provisions of Article Nine of the Charter. The Plaintiff's breach of contract claim must be dismissed.

C.    *AMC*

AMC has moved to dismiss, arguing that the pleadings do not adequately allege that any of the Challenged Transactions constituted breaches of AMC's fiduciary duties to Southern Copper.[94] A majority stockholder, when it manipulates the corporate machinery as a controller, is a fiduciary for the minority. Accordingly, where a controlling stockholder stands on both sides of a transaction, "the applicable standard of judicial review is entire fairness," rather than the deferential business judgment standard.[95] "Entire fairness is not triggered solely because a company has a controlling stockholder," however.[96] The controller must actually assert control over the entity, for instance by causing the company to engage in a conflicted

---

[94] With admirable candor, AMC now concedes that it stands on both sides of the Minerals Contracts. Based on the parties' letter of October 23, 2020, I need not consider the Minerals Contracts further with respect to AMC, but I discuss it regarding the balance of the Motion to Dismiss. *See* Ltr. to the Honorable Sam Glasscock, III, from Matthew F. Davis, Esq, Dkt. No. 114.

[95] *Americas Mining Corp. v. Theriault*, 51 A.3d 1213, 1239 (Del. 2012); *see also Kahn v. M & F Worldwide Corp.*, 88 A.3d 635, 642 (Del. 2014); *Kahn v. Tremont Corp. (Tremont II)*, 694 A.2d 422, 428 (Del. 1997); *In re EZCORP Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *11 (Del. Ch. Jan. 25, 2016).

[96] *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *12 (Del. Ch. Oct. 24, 2014); *see also Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971) (Entire fairness "will be applied only when the fiduciary duty" owed by a parent company to its subsidiary "is accompanied by self-dealing.").

23

transaction or by extracting a unique benefit not shared with the other stockholders, for the standard to apply.[97]



**Figure 1**

It is undisputed that AMC is a controlling stockholder of Southern Copper.[98] Additionally, AMC has conceded that, with respect to the Minerals Contracts, it stood on both sides of the transactions, which the Amended Complaint alleges were unfair to Southern Copper.[99] The resulting standard is entire fairness; accordingly,

---

[97] *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at \*12; *In re Martha Stewart Living Omnimedia, Inc. S'holder Litig.*, 2017 WL 3568089, at \*11 (Del. Ch. Aug. 18, 2017).

[98] *See* Am. Compl. ¶¶ 8, 30–31 (noting that AMC owns 88.9% of Southern Copper); AMC Opening Br. 17–18, 34, 36–37 (acknowledging AMC's controlling stake in Southern Copper and conceding that AMC stood on both sides of certain of the Minerals Contracts).

[99] The web of interactions among Grupo México, its wholly-owned subsidiary AMC—the majority stockholder of Southern Copper—and the other related entities—AMC's sibling companies—is graphically represented in Figure 1. The solid lines indicate control; the broken lines indicate the contractual counterparties to the Challenged Transactions.

AMC cannot be dismissed from this action.[100] AMC argues, however, that (Minerals Contracts excluded), it did not stand on both sides of the Challenged Transactions, and also is not alleged to have taken any action in direction of Southern Copper with respect to those transactions. Accordingly, per AMC, I should dismiss the claim against it, at least regarding those transactions.[101]

The Plaintiff, in the Amended Complaint, does not specifically allege any action that AMC took to cause Southern Copper to award any of the contracts underlying the Challenged Transactions directly to Grupo México or its subsidiaries, nor does it allege actions that facilitated the ultimate controllers' control of Southern Copper. The Amended Complaint only alleges in conclusory fashion that "[t]he Controllers caused Southern Copper" to enter the Challenged Transactions, in violation of their fiduciary duties.[102] Per the Plaintiff, this is sufficient, because "[w]hether AMC was the specific counterparty to a particular transaction is irrelevant . . . [since] AMC was the vehicle through which [Germán Larrea] and Grupo México controlled [Southern Copper]."[103]

---

[100] *See* Ltr. to the Honorable Sam Glasscock, III, from Matthew F. Davis, Esq. 2, Dkt. No. 114; AMC Opening Br. 4; Reply Br. of Grupo México and AMC 4, Dkt. No. 78.

[101] AMC Opening Br. 4, 37–38.

[102] Am. Compl. ¶ 160.

[103] Pl.'s Omnibus Answering Br. in Opp'n to all Defs.' Mots. to Dismiss 19, Dkt. No. 73 [hereinafter Pl.'s Answering Br.].

The Plaintiff relies here on *In re EZCORP Inc. Consulting Agreement Derivative Litigation.*[104] In *EZCORP*, Vice Chancellor Laster applied entire fairness to advisory service agreements between EZCORP and an entity affiliated with its ultimate controller, Cohen.[105] The entirety of EZCORP's voting stock was owned by a limited partnership (an "L.P.") and Cohen was the sole owner of a corporation that was the sole general partner of that L.P.[106] At the pleadings stage, the Court found sufficient to an aiding-and-abetting claim[107] against these entities specific allegations that Cohen had used the entities in asserting his control over EZCORP.[108] The Court held that both Cohen, as the human controller, and the two entities through which he controlled EZCORP, were proper defendants and entire fairness was the proper standard.[109]

The Plaintiff argues that the *EZCORP* rationale controls here. The flaw in this argument is that, unlike in *EZCORP*, the Amended Complaint here does not allege that Grupo México or Germán Larrea caused AMC to violate its duties to Southern Copper with respect to the Challenged Transactions, or that AMC took any action at

---

[104] 2016 WL 301245 (Del. Ch. Jan. 25, 2016).
[105] *See id.* at *11–31.
[106] *See id.* at *2.
[107] The theory of liability against the entity defendants in *EZCORP*, unlike here, was alternatively for aiding and abetting Cohen's breach of duty. *See id* at *31. The Court noted, in any event, that the plaintiff could successfully plead a direct breach of duty claim against these entities. *See id.* at *10, *31.
[108] The Court noted that once the conflicted transaction at issue was cancelled by the EZCORP board, Cohen used the entities to "clean house" by removing some of the directors. *Id.* at *6.
[109] *Id.* at *31.

all (setting aside the Minerals Contracts) with respect to these transactions (the "Non-Minerals Contracts," or "NMCs").[110] Nor does it allege that AMC used its control to exert any influence over Southern Copper or its Board in way of the NMCs. The Amended Complaint simply alleges the chain of control and asserts that liability must attach as a result.[111]

With respect to the Non-Minerals Contracts, the facts alleged in the Amended Complaint specifically concerning AMC are only that AMC is a controlling stockholder of Southern Copper and that the NMCs were unfair to Southern Copper. AMC is not alleged to have stood on both sides of or obtained any unique, non-ratable benefit from the transactions. The counterparties to the NMCs are subsidiaries of *Grupo México*, not AMC. To the extent there was a non-ratable benefit to be derived from those transactions, that benefit would have flowed to

---

[110] It is a fundamental principle that a corporation's day-to-day affairs are run by the directors, not the stockholders. 8 *Del. C.* § 141. And "director primacy remains the centerpiece of Delaware law, even when a controlling stockholder is present." *In re CNX Gas Corp. S'holders Litig*, 4 A.3d 397, 415 (Del. Ch. 2010). It is therefore also well-settled that controlling or majority stockholders owe fiduciary duties only when the stockholder "utilizes the corporate machinery to take action." *Gilbert v. Perlman*, 2020 WL 2062285, at *1 (Del. Ch. April 29, 2020); *Ford v. VMware, Inc.*, 2017 WL 1684089, at *21 (Del. Ch. May 2, 2017). Accordingly, unless a controlling stockholder is alleged to have *acted* to control the corporation or circumstances arise that create suspicion that such control has happened—*i.e.* when the company enters a conflicted transaction with the controller or when the controller receives a non-ratable benefit—there can be no business decision to which judicial review of the actions of the majority stockholder can apply. In *EZCORP*, the intermediary controller was the vehicle through which Cohen exercised control to retaliate against and replace directors who voted to terminate a conflicted ongoing business relationship. Here, there are no allegations of any action through which AMC is alleged to have exerted control on behalf of Germán Larrea or Grupo México.

[111] The Amended Complaint alleges only that "[t]he Controllers caused Southern Copper to award each of the contracts underlying the Challenged Transactions." Am. Compl. ¶ 160.

Grupo México, its ultimate controller Germán Larrea,[112] or other of its subsidiaries, not to AMC. The facts pled with respect to the NMCs, that AMC controls Southern Copper and is itself controlled by Grupo México, without more, do not support an inference that AMC breached its fiduciary duties to Southern Copper.

## III.  Conclusion

For the reasons stated above, the Motion to Dismiss Count I is granted and the Motion to Dismiss defendant AMC is granted in part and denied in part.

The parties should submit an appropriate form of order.

---

[112] Germán Larrea, who is alleged to be the ultimate controller, remains a party to this action as both a controller and a member of Southern Copper's Board.